Xu Ming LI; Xin Kui Yu, Petitioners,

v.

John ASHCROFT, Attorney
General, Respondent.

No. 00–70157.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 16, 2003.

Filed Jan. 29, 2004.

Robert B. Jobe (argued), Law Office of Robert B. Jobe, San Francisco, CA, and Michael P. Karr, Michael P. Karr & Associates, Sacramento, CA, for the petitioners.

Greg D. Mack (argued), Alison R. Drucker and Russell J.E. Verby, U.S. Department of Justice, Washington, DC, for the respondent.

Dr. John Aird, Silver Spring, MD, amicus curiae in support of petitioners.

Before: SCHROEDER, Chief Judge, PREGERSON, REINHARDT, T.G. NELSON, KLEINFELD, HAWKINS, THOMAS, GRABER, WARDLAW, PAEZ, and CLIFTON, Circuit Judges.

Opinion by Judge MICHAEL DALY HAWKINS; Dissent by Judge KLEINFELD.

MICHAEL DALY HAWKINS, Circuit Judge:

In this fact-intensive case, we examine the reach of congressional efforts to ease immigration asylum requirements for individuals affected by China's population control policies. In 8 U.S.C. § 1101(a)(42)(B), Congress made clear that individuals forced to undergo abortion or sterilization

would be deemed to have been persecuted on account of political opinion. At issue here is the application of another category of asylum-seekers covered by this statute: those persecuted for "other resistance" to those policies. *Id.* Specifically, we must determine whether a young woman who announced her opposition to government population control policies and is thereafter subjected to a forced gynecological exam and threatened with future abortion, sterilization of her boyfriend, and arrest satisfies this latter category. Because we determine that she does, we grant the petition for review of Xu Ming Li ("Li") and remand the petition of Xin Kui Yu ("Yu") for further consideration in light of the grant to Li.

## FACTS AND PROCEDURAL HISTORY

Li and her boyfriend, Yu, lived in a rural village in the province of Fujian, China. After they met, they formed a nearly immediate attachment. They spent a great deal of time with each other and were quite open about their desire to marry. Within days of their first meeting, false rumors spread in the village that Li and Yu were living together and that Li was pregnant. This led to a visit by a local population control officer. Accused of being pregnant and told to end her relationship with Yu, Li responded by stating: "I'm going to have many babies ... you have nothing to do with this." The village official responded with a pointed warning: "You will pay for this."

Two days later, two government nurses picked up Li from her home and took her to the local birth control department, where two men pinned her down on a bench while a doctor conducted a forced gynecological examination. Surrounded by four persons involved in the thirty-minute examination, Li screamed in protest to no avail. Her attempts to resist were overcome by brute force. After the officials determined that Li was not pregnant, she was again pointedly warned: "If you keep on doing this, we will take you back any minute we want to give you [another] examination. And if you are found to be pregnant, then you are subject to abortion and your boyfriend will also be ... sterilized."

Thereafter, Li and Yu applied for a marriage license and were denied for not meeting the minimum age requirements. They proceeded to mail out wedding invitations announcing their intention to marry anyway, but when Li and Yu learned that warrants had been issued for their arrest, they fled China prior to getting married. Periodic visits by security officials to the homes of Li and Yu then began and continued through the time of the hearing before the Immigration Judge ("IJ").

After fleeing China, Li and Yu came to the United States, where the Immigration and Naturalization Service ("INS") issued Notices to Appear to both, alleging that they were subject to removal. Both were brought before the IJ. Conceding their removability, Li and Yu applied for political asylum and withholding of removal and brought requests for relief under Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). 8 U.S.C. § 1231(b)(3)(A); CAT, opened for signature Feb. 4, 1985, S. Treaty Doc. No. 100–20, at 20 (1988). The IJ found Li's and Yu's hearing testimony to be entirely credible, but denied relief, determining that Petitioners had failed to demonstrate persecution. Petitioners were ordered removed to China. Petitioners appealed to the Board of Immigration Appeals ("BIA"), which adopted the reasoning of the IJ and dismissed the appeal, making the removal order final on January 13, 2000. Li's and Yu's petitions for review to this court were timely filed.

A three-judge panel affirmed the BIA's denial of Petitioners' asylum, withholding of removal, and CAT claims. *Li v. Ashcroft,* 312 F.3d 1094 (9th Cir.2002). We vacated the panel opinion and agreed to rehear this case *en banc. Li v. Ashcroft,* 335 F.3d 858 (9th Cir.2003). As a result, this is the first opinion of a circuit court to address Congress's "other resistance" language.

The BIA had jurisdiction under 8 C.F.R. § 3.1(b)(3). We have jurisdiction under 8 U.S.C. § 1252(a) and 8 C.F.R. § 208.18(e).

## STANDARD OF REVIEW

We review factual findings underlying the denial of an asylum application for "substantial evidence." *See INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). The BIA's determination must be upheld if " 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.' " *Id.* (quoting 8 U.S.C. § 1105a(a)(4)). To reverse the BIA we must find that the evidence presented by Petitioners was such that a reasonable fact-finder would be compelled to conclude that Petitioners were persecuted or had a well-founded fear of persecution based on their resistance to China's population control policies. *See id.*

## DISCUSSION

Section 208(a) of the Immigration and Nationality Act ("INA") gives the Attorney General discretion to grant political asylum to any alien determined to be a "refugee" within the meaning of the INA.

8 U.S.C. § 1101(a)(42)(A); 8 U.S.C. § 1158(b)(1). A refugee is defined as one who is unable or unwilling to return to his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.*[1]

In 1996, Congress specifically added language to the Illegal Immigration Reform and Immigrant Responsibility Act to overrule a BIA decision holding that subjection to China's one-child policy, including forced sterilization, would not constitute persecution *"on account of* race, religion, nationality, membership in a particular social group, or political opinion." *In re Chang,* 20 I. & N. Dec. 38, 1989 WL 247513 (BIA 1989) (emphasis added). Concern for the victims of these harsh population control practices prompted Congress to amend the definition of "refugee" to include "a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program." 8 U.S.C. § 1101(a)(42)(B).

Asylum has been granted under this amendment to persons who were forcibly sterilized as well as to their spouses. *In re X–P–T,* 21 I. & N. Dec. 634, 635, 1996 WL 727127 (BIA 1996); *In re C–Y–Z,* 21 I. & N. Dec. 915, 1997 WL 353222 (BIA 1997). But prior to this case, no circuit has addressed the meaning of the phrase "other resistance to a coercive population control program." 8 U.S.C. § 1101(a)(42)(B).

---

1. An alien may alternatively be entitled to withholding of deportation upon showing a "clear probability" that the alien's life or freedom would be threatened in his or her home country on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1253. "Clear probability" requires a showing that persecution is "more likely than not" a slightly more stringent standard than the showing of a "well-founded fear" required for eligibility for asylum. *Rebollo–Jovel v. INS,* 794 F.2d 441, 443 (9th Cir.1986). However, once an applicant meets this threshold, relief is mandatory. *Navas v. INS,* 217 F.3d 646, 655 (9th Cir.2000).

## A. Li's Asylum Claim

Li qualifies for asylum under the "other resistance" category of the statute. Her testimony, which the IJ found credible, compellingly demonstrates that she was persecuted on account of her resistance to a coercive population control program. *See* 8 U.S.C. § 1101(a)(42)(B).

### 1. "Persecution"

 The BIA concluded that Li failed to demonstrate "persecution" and hence ended the analysis with that conclusion. The record, however, compels a contrary conclusion. Our caselaw characterizes persecution as "an extreme concept," marked by "'the infliction of suffering or harm . . . in a way regarded as offensive.'" *Fisher v. INS*, 79 F.3d 955, 961 (9th Cir.1996) (en banc) (quoting *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir.1995)).

Li's forced pregnancy examination and the events that followed clearly constitute persecution. Following through on threats that she would "pay" for her announced opposition to government policy, local offi-cials forcibly took Li to a birth control center where she was put on a bench and held down by two nurses. Even by rudimentary medical standards, the examination that followed was crude and aggressive: Li's uterus, vagina, and cervix were probed while she resisted by kicking and screaming in fear. This examination went on for half an hour over Li's vehement protests.[2] When it was finally determined that Li was not pregnant, she was told that at any time in the future, she could be subjected to the same sort of test, and that if she were pregnant, she would be subject to forced abortion and her boyfriend sterilized. The timing and physical force associated with this examination compel the conclusion that its purpose was intimidation and not legitimate medical practice.[3]

 The "substantial evidence" standard of review means we must be deferential to the BIA's conclusions. But deference does not mean blindness. Here, the evidence regarding Li's forced pregnancy examination is so compelling that it dictates the conclusion that she did suffer persecution.[4] *See Ghaly*, 58 F.3d at 1431.

2. Making an argument never made by the government in its briefs, the dissent suggests that what happened to Li was no different than a "standard Chinese village obstetric procedure[ ]" and goes on to analogize Li's forced pregnancy exam to other routinely mandated medical procedures. [Dissent at 1167]. A forced gynecological examination lasting thirty minutes and attended by threats does not meet any civilized understanding of a routine medical procedure.

3. Early pregnancy is best and most often detected by a blood or urine test that detects the ß subunit of human chorionic gonadotropin (HCG). Lori A. Bastian, MD, MPH and Joanne T. Piscitelli, MD, *Is This Patient Pregnant? Can You Reliably Rule in or Rule Out Early Pregnancy by Clinical Examination?*, Journal of the American Medical Association, Aug. 20, 1997, at 588. *See also Williams Obstetrics*, 26–28 (21st ed.1997). A physical examination may detect evidence of pregnancy, such as a change in color in the vaginal mucosa (the "Chadwick sign"), or the softening of the cervix, but neither sign is usually detectable prior to six weeks gestational age. *Williams Obstetrics* at 25–26; Bastian and Piscitelli at 587. The record demonstrates that Li and Yu met only two and one-half weeks prior to the examination. Thus, the physical examination would not have yielded any of the signs of pregnancy, if Li were indeed pregnant.

4. Li describes her experience as rape-like. Given her refusal to consent to the physically invasive and emotionally traumatic examination of her "private parts," this analogy is certainly not far-fetched. And, as we have recognized, rape may constitute persecution. *Lopez–Galarza v. INS*, 99 F.3d 954 (9th Cir. 1996); *see also Shoafera v. INS*, 228 F.3d 1070, 1074 (9th Cir.2000).

The dissent's reliance on *Prasad v. INS*, 47 F.3d 336 (9th Cir.1995) and *Hoxha v. Ashcroft*, 319 F.3d 1179 (9th Cir.2003) is mis-

Li has not only demonstrated past persecution sufficient to establish her eligibility for asylum, but she has also demonstrated a clear fear of future persecution. 8 U.S.C. § 1101(a)(42). The applicable two-part test requires examination of both objective and subjective components. "The subjective component may be satisfied by credible testimony that the applicant genuinely fears persecution." *Prasad v. INS*, 47 F.3d 336, 338 (9th Cir.1995) (citing *Acewicz v. INS*, 984 F.2d 1056, 1061 (9th Cir.1993)). Li testified that when she fled China, she was even afraid to call home because she was worried that her telephone call would be traced and that the Chinese government would send someone to arrest her. Added to this was her testimony about the post-exam threats that she could be forced to undergo a pregnancy examination at any time. Further, she was issued a government document indicating that she and her boyfriend could not have a baby for the rest of their lives. For these reasons, she fled from and fears returning to China. This credible testimony satisfies the subjective fear of future persecution part of the test. The objective inquiry requires Li to show the reasonableness of her fear of persecution. *See Shirazi–Parsa v. INS*, 14 F.3d 1424,

1427 (9th Cir.1994) (overruled on other grounds by *Fisher v. INS*, 79 F.3d 955 (9th Cir.1996) (fear must have an objective basis in reality)). It can be satisfied by a showing of past mistreatment rising to the level of persecution. *See Navas v. INS*, 217 F.3d 646, 655–56 (9th Cir.2000). Li's forced examination, the accompanying threats of future abortion and/or sterilization procedure, and the issuance of a warrant for her arrest, all compellingly demonstrate that she has an objective fear of future persecution should she be forced to return to China.

Having determined that the record compels the conclusion that Li was persecuted in the past and also has a fear of future persecution, we turn to the other part of the asylum test, namely that her persecution was on account of her resistance to a coercive population control program.

2. "Coercive Population Control Program"

The "coercive population control program" that Li resisted was two-fold. It (1) set a minimum marriage age for men and women, which neither petitioner had reached at the time of the events in question, and (2) limited family size to one child per married couple.[5] There was ample

---

placed. [Dissent at 1167–1168]. *Prasad* held that detention combined with a physical attack could constitute persecution, but that the specific attack against Prasad where he was "hit on his stomach and kicked from behind" was not "so overwhelming as to necessarily constitute persecution." 47 F.3d at 339. Li's "rape-like" exam was such a personal invasion of her body that the two cases can hardly be compared. *Hoxha* is similarly inapposite. There, the court found that the one incident of physical violence was not connected to any specific threat and that all other threats against the Petitioner were harassment and not persecution because they were unfulfilled. *Hoxha*, 319 F.3d at 1182. In Li's case, there was a clear threat when the government official told her she would "pay" followed by a forced physically invasive exam just two-days later.

**5.** The Government argued, and the dissent finds a "permissible reading" of the record, that Li resisted the marriage laws only and not the population control policy, relying on Li's applying for a marriage license, sending out wedding invitations, and testifying that she and Yu came to America "to get married and then ... find employment...."

The early marriage policy is an integral part of the population control policy. Nevertheless, in the case before us, Li and Yu opposed not only the early marriage aspect of the policy, but clearly and forcefully resisted the restrictions placed on the number of children a family may legally have. Importantly, this resistance, for which Li was subjected to the forced pregnancy exam, occurred before she ever applied for a marriage license.

The dissent also points to the Government's argument that because Petitioners have now

evidence, including testimony from the mayor of a neighboring city in the Fujian province, that China's coercive population control program was in effect in the city in which Li lived at the time of her "examination."

### 3. "Resistance"

██ Li resisted this coercive population control program in two ways: vocally and physically. First, she vocally resisted the marriage-age restriction when she told the village official that she wanted "freedom for being in love" and when she publicly announced her decision to marry even after a license was refused. She also resisted the one-child policy when she told the official she intended "to have many babies," that she did "not believe in the policy" limiting family size, and that she did not want him to "interfere." Second, she resisted physically by kicking and struggling when forced to undergo a gynecological examination.

### 4. "On Account Of"

██ For persecution to qualify as "on account of," the applicant must possess a protected characteristic and that protected characteristic must have motivated the persecutor to harm the applicant. *Elias–*

*Zacarias,* 502 U.S. at 481, 112 S.Ct. 812. Congress determined that those who resist coercive population control policies should enjoy protection. *See* 8 U.S.C. § 1101(a)(42)(B). Li fits into this category and thus possesses a protected characteristic. The only question, then, is whether her resistance motivated the government officials to harm her through the forced pregnancy examination.

Li clearly would not have been forcibly examined for pregnancy but for her resistance to China's population control program. When confronted about her relationship with her boyfriend and told to end it, she defied the village official with her comments about not believing in the policy, having many children with her boyfriend, and directing the official not to interfere in her life. The forced pregnancy exam which Li underwent occurred just two days after this exchange. Therefore the exam, which we determined to be persecution, was clearly "on account of" her attempts to resist the population control policies, and Li has demonstrated the requirements of the statute.

██ Although we determine that Li is eligible for asylum, the ultimate decision to grant asylum is discretionary.[6] We do

---

reached legal age to marry, they could now marry and start a family without violating the law, and thus that the BIA could have reasonably concluded that Li and Yu now have "nothing to fear." Yet a warrant for Li's arrest remains in effect. Even after she would have reached legal age to marry in China, officials have continued to periodically visit her house in China, purportedly looking to arrest her. Li herself testified that if she went back to China, she believes she would be arrested and jailed. As Li clearly resisted the population control program by resisting the actual pregnancy exam and informing the village official that came to visit her house that she would not abide by the prohibitions on multiple pregnancies or pregnancies prior to marriage, we are not presented with the question of whether resistance to the marriage-age

aspect of the program alone would satisfy the statutory standard.

**6.** It was indicated at oral argument that there was a cap on the number of yearly asylum grants to those persecuted for resistance to a coercive population control policy. If that cap has already been met, Li could be granted conditional asylum until she can adjust her status consistent with the cap. *See Matter of G–C–L–*, 23 I & N Dec. 359, 2002 WL 1001051 (BIA 2002) and *Matter of Y–T–L*, 23 I & N Dec. 601, 608, 2003 WL 21206539 (BIA 2003) (BIA granted asylum "conditioned upon an administrative determination by the Service that a number is available for such a grant under section 207(a)(5) of the Act, 8 U.S.C. § 1157(a)(5) (2000)").

anticipate, however, that the Attorney General will give appropriate consideration to this court's view of the seriousness of Li's treatment at the hands of Chinese officials and the threat she faces if returned.

While asylum is discretionary, withholding of removal is mandatory. As this separate issue of withholding of removal was neither fully briefed nor argued specifically to the en banc court, we do not decide it at this time.

We also need not address Li's CAT claims at this time. We grant her petition for review.[7]

### B. Yu's Asylum Claim

The IJ and BIA also denied Yu's asylum claim. In many ways, his claim factually parallels Li's. According to Yu's testimony, he fears future persecution stemming from the threat of future sterilization and the outstanding warrant for his arrest. Yu may also be able to demonstrate resistance to a coercive population control policy through his testimony indicating that he decided to get married, even when he was denied a license by the village leader, in an attempt to avoid the future harm to the couple that was threatened when Li was forcibly examined. Thus Yu may qualify for asylum in his own right.

Because the record is less developed as to Yu, however, it is appropriate to remand his case to the BIA for consideration of his petition in light of our grant to Li. *See INS v. Ventura,* 537 U.S. 12, 14–18, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam) (remand appropriate where asylum issue not fully considered by the BIA).

### CONCLUSION

We grant Li's petition and remand for further proceedings consistent with this opinion. Petition remanded as to Petitioner Yu.

KLEINFELD, Circuit Judge, dissenting:

I respectfully dissent.

If the Supreme Court speaks, and lower courts do not hear it, does it make law? Last year, in *INS v. Ventura,* the Supreme Court chastised us for failing to defer properly to the BIA in an asylum case.[1] Summarily reversing us, the Court said we "committed clear error" and "seriously disregarded the agency's legally mandated role."[2] Before that, in *INS v. Aguirre–Aguirre,* the Supreme Court unanimously reversed us for failing "to accord the required level of deference" to the BIA in a case involving withholding of removal.[3]

---

7. The dissent's suggestion that *INS v. Ventura,* 537 U.S. 12, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002), requires a remand to the agency is misplaced. The IJ, whose opinion we effectively review because it was adopted by the BIA, reviewed all the evidence, found the claimant's testimony credible, and considered whether Li's actions were on account of resistance to a coercive population control policy.

The IJ found that the conduct and circumstances of the examination did not amount to persecution, but accepted the testimony that demonstrated the exam was in retaliation for, or "on account of," Li's opposition to the population control policies. The IJ also concluded that it could be said that Li offered resistance to a coercive population control

program when she was forcibly subjected to the medical examination. The IJ thus did consider whether Li resisted a coercive population control policy. There is therefore no need to remand under *Ventura* for the agency to consider whether any persecution was on account of resistance to a coercive population control program. The agency has already considered the factual and legal contentions as to Li's claims.

1. *INS v. Ventura,* 537 U.S. 12, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam).

2. *Id.* at 17, 123 S.Ct. 353.

3. *INS v. Aguirre–Aguirre,* 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999).

And before that, in *INS v. Elias–Zacarias*, the Supreme Court reversed our asylum decision because we failed to apply correctly the substantial-evidence standard and defer to the BIA.[4] Yet today we make the same mistakes.

There are two things wrong with the majority opinion. Procedurally, it makes the initial decision instead of remanding to the INS on whether what we determine to be persecution was on account of resistance to a coercive population-control program. This is an issue the BIA did not reach and has not yet decided. *Ventura* requires us to remand so that the BIA can make the initial decision on this point if we find, as the majority does, that there was persecution.[5] Second, the majority substitutes its own judgment for the BIA's on whether the offensive treatment of Li amounts to "persecution," instead of deferring to the administrative agency's reading of the record under the substantial-evidence standard, as *Elias–Zacarias* requires.[6]

## I. *Failure to Remand*

The BIA held that the mistreatment of Li did not amount to persecution. The majority opinion holds that it does. Assuming *arguendo* that the majority is correct, the next issue is whether the persecution was on account of "resistance to a coercive population control program."[7] The BIA never reached this second issue. It did not decide the "on account of" ques-tion because Li lost on whether her mistreatment amounted to persecution. Thus our court decides this issue without giving the BIA a chance to decide it first.

We cannot properly do that. We did it in *Ventura* because, under our reading of the record, the answer was clear. We held that "when it is clear that we would be compelled to reverse the BIA's decision if the BIA decided the matter against the applicant," remand was unnecessary.[8] The Supreme Court reversed summarily.[9] The Court held that "the law entrusts the agency to make the basic asylum eligibility decision" and "'judicial judgment cannot be made to do service for an administrative judgment.'"[10] Except in "'rare circumstances,'" we must remand, because a "court of appeals 'is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.'"[11] We were mistaken in *Ventura* to believe that the record was conclusive, because it could be read as ambiguous, and because additional evidence might have come in on remand.[12] We thereby committed "clear error" that "seriously disregarded the agency's legally mandated role."[13]

When the administrative state first burgeoned, the lower courts needed some bludgeoning before they deferred, for example, to the NLRB on labor matters. We now defer readily to the NLRB and

---

4. *INS v. Elias–Zacarias*, 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

5. *See Ventura*, 537 U.S. at 14, 123 S.Ct. 353.

6. *See Elias–Zacarias*, 502 U.S. at 481, 112 S.Ct. 812.

7. 8 U.S.C. § 1101(a)(42).

8. *Ventura v. INS*, 264 F.3d 1150, 1157 (9th Cir.2001), *quoted in Ventura*, 537 U.S. at 15, 123 S.Ct. 353.

9. *Ventura*, 537 U.S. at 14, 123 S.Ct. 353.

10. *Id.* at 16, 123 S.Ct. 353 (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943)).

11. *Id.* (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)).

12. *Id.* at 17–18, 123 S.Ct. 353.

13. *Id.* at 17, 123 S.Ct. 353.

many other agencies. But for some reason, the INS and a few others just do not get the deference we are required by statute and the plainest possible language in Supreme Court decisions to give them. I do not believe the law authorizes us to pick and choose which agencies get standard administrative-law deference.

As in *Ventura*, the record here is capable of different interpretations, and new evidence could be introduced on remand that might affect the decision as to whether Li's persecution (accepting *arguendo* that it was persecution) was on account of "resistance to a coercive population control program." [14] Under *Aguirre–Aguirre*, the INS, through the BIA, is in the first instance responsible for interpreting what its statute means when there is ambiguity. [15] Although the Immigration Judge noted that "it could be said" that Li was opposing the population-control program when she resisted the medical examination, no finding on that point was made or needed, because the IJ found that what was done to her did not amount to persecution. [16]

The majority interprets the abusive medical examination and threatening remarks as persecution for opposing a Chinese population-control program. Another permissible reading, however, is that Li was refusing to cooperate with the Chinese law governing minimum age for marriage, something different from the coercive population-control program of involuntary abortions and sterilizations. The BIA might read the statute as limiting the catch-all phrase, "other resistance to a coercive population control program," to programs in the nature of forced abortions and involuntary sterilizations. I rather

suspect that it would be so read. Here is the text of the statute:

> For purposes of determinations under this Act, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion. [17]

The most natural reading of this statute is as a response to our revulsion at a government that forcibly and nonconsensually aborts fetuses and sterilizes people. That response is to treat as refugees those subjected to such measures, as well as those who are persecuted for avoiding, refusing, or resisting them. Under the principle of *noscitur a sociis*, the general language, "coercive population control program," ought to be construed to mean programs similar to or in the nature of forced abortions and involuntary sterilizations, the specific terms in the statute. [18]

The majority prefers a reading that avoids the statutory focus on abortion and sterilization. It reads the catch-all language "or for other resistance to a coercive population control program" as though it stood all by itself, leaving us free to speculate as to what sort of "coercive population control program" Congress might have had in mind. When one reads these terms

---

**14.** 8 U.S.C. § 1101(a)(42).

**15.** *Aguirre–Aguirre,* 526 U.S. at 424–25, 119 S.Ct. 1439.

**16.** E.R. at 69, 70.

**17.** 8 U.S.C. § 1101(a)(42).

**18.** *See* 2A Norman J. Singer, *Statutes and Statutory Construction* § 47.16 (5th ed.1992).

out of their context, they could include a vast array of policies. Does the statute mean a higher age for marriage? Does it mean coercing children to attend sex education courses in school? Does it mean a government housing policy that makes it hard to get the large apartments that larger families need? Who knows, until we say, since we do not afford the administrative agency an opportunity to say, and since we divorce the "resistance" provision from its context, enabling us to roam far afield through government policy that affects number of children.

Nor does the majority's expansion of the statutory phrase "resistance to a coercive population control program" to include the minimum age of marriage make sense of the word "coercive," since the age of marriage does not coerce anyone to do anything or to suffer someone else to do it to them against their will, as "forced" abortion and "involuntary" sterilization do. Also, the higher marriage age does not necessarily restrain people from having the number of children they want. It is thus not necessarily a population-control program. People can marry at 20 or 22, the minimum ages for women and men in Li's village, and still have 2, or 3, or 10 children, if their individual biology and preferences lead them to do so and the government does not forcibly abort their children or sterilize them.

The INA also provides for a maximum of 1,000 asylum grants per year under the provision that Li invokes.[19] One-thousand grants could hardly have been a serious attempt to deal with the problem if Congress meant to grant asylum to anyone who resisted any government program having to do directly or indirectly with population growth, including a minimum age of marriage that seems high to us

(high as a legal minimum, though American custom now has most people marrying at a later age than the Chinese minimum). The majority turns a law responding to revulsion at forced abortions and compulsory sterilizations into an altogether new law, protecting young love.

The majority tosses off these concerns with an *ipse dixit* that "[t]he early marriage policy is an integral part of the population control policy."[20] The majority also claims that Li saying "I'm going to have many babies with my boyfriend," when she was confronted about the couple's relationship, turns this into something like a forced-abortion case.[21] This reasoning is a substitution of something at or beyond the fringe of what the statute addresses for that which is at its core: forced abortions and sterilizations. In any event, *Ventura* requires us to leave this construction of the statute to the agency in the first instance. Then, after the agency construes it, we will be required by *Aguirre–Aguirre* to defer to that construction rather than go off on a jaunt of our own as though the agency had no authority to speak.

If it were established that the forced pregnancy examination was "persecution," and the BIA then had to decide whether the persecution followed resistance to a coercive population-control program, it could permissibly choose an interpretation of the statute under which Li's actions did not qualify. Also, the BIA could decide that the repulsive medical examination resulted from the crudeness of Chinese village medicine and was not, as the majority implies, sadistic punishment to deter resistance. As for the threats, the BIA could conclude that they were not motivated by retaliation for political resistance to Chinese population control, but rather were in

---

**19.** 8 U.S.C. § 1157(a)(5).

**20.** Maj. Op. at 1159–1160 n. 5.

**21.** E.R. at 136.

the nature of abusive remarks responding to Li's failure to cooperate with the medical personnel.

In the end, even if (1) the medical examination and threats were deemed persecution and (2) no further evidence was introduced on remand, the BIA on remand could still decide on this record that the persecution was not "for other resistance to a coercive population control program." There are several ways to read the law and the record on the question whether any persecution was a result of "resistance to a coercive population control program." Under *Ventura* and *Aguirre–Aguirre*, we must remand to let the BIA deal with this issue.

The majority responds to *Ventura* with a footnote summarily claiming that the BIA already did decide that the forced pregnancy examination and the threats were retaliation for resistance to coercive population control.[22] Not so. Believing Li about what happened (as the IJ did) is not the same thing as deciding that the reason it happened is that the government wanted to punish her for resisting a coercive population-control program. Here is what the IJ, whose opinion the BIA adopted, actually said:

> The female applicant in this case is single. She has not been pregnant. She has not been forced to abort a pregnancy. She has never been forced to undergo an involuntary sterilization. The one incident where it could be said that she offered resistance to a coercive population control program is when she was forced to take a medical examination.... However, the requirement under Section 101 [8 U.S.C. 1101(a)(42)] was not only for "other resistance to a coercive population control program," but also required that the alien must have been "persecuted." In this case,

neither the female Applicant or male Applicant have been subject to any arrest or any treatment that could rise to the level of past persecution.[23]

This cannot fairly be read as a determination by the IJ (1) that the age-of-marriage law is part of a coercive population-control program, and (2) that resistance to the age-of-marriage law is resistance to a coercive population control program, and (3) that such resistance motivated the pregnancy examination. All it can fairly be read to say is that the pregnancy examination did not rise to the level of persecution. The majority pretends not to recognize the passage's subjunctive mode, "it could be said," and the "assuming *arguendo*" approach to legal reasoning. The agency simply did not have to, and did not, decide whether the reason for Li's persecution was resistance to a coercive population control program, because it decided that she was not persecuted at all.

The disingenuous reading of the IJ's decision accomplishes, in substance, the same error we made in *Ventura*. We do not have a determination from the agency that tells us whether that which the agency says is not persecution and the majority says is persecution, was on account of resistance to a "coercive population control program." One reading of the majority's treatment of what the IJ said is that the majority is sure that what happened was on account of "resistance to a coercive population control program." Another reading is that the majority does not care whether the statute is satisfied, because the pregnancy examination is so repulsive to us. The latter would be illegitimate, because it skips a statutory requirement, so I shall assume that the former is correct. But the former is what *Ventura* says we cannot do. The majority says that

---

**22.** *See id.* at 1161 n. 7.

**23.** E.R. at 69–70.

*Ventura* is not a problem, because the IJ "accepted the testimony that demonstrated the exam was in retaliation for, or 'on account of,' Li's opposition to the population control policies." [24] In *Ventura* we also thought the record "demonstrated" the conclusion we reached. The Supreme Court said that that was not enough. The issue is not whether the testimony demonstrates something to us, but rather whether it demonstrates something *to the agency.*

The IJ knew how to make it clear when he was making a finding and when he was assuming something *arguendo:* "this Court makes a *finding* of credibility"; "Evidence in the record would support a *finding* that these two Applicants knew ... that they were not [of the required age]"; "there is no way to make a *finding* whether the rumors they heard about the arrest were well-founded or not." [25] And concluding his asylum discussion: *"I find,* based on all the evidence in the record, that both Applicants have failed to establish past persecution as to warrant a grant of asylum." [26] The question whether there was persecution decided the case and was the only factor on which the IJ made a holding. Both the context and the subjunctive mode showed unambiguously that the IJ was *not* making a holding that the forced pregnancy examination was on account of resistance to a coercive population-control program when he referred to "[t]he one incident where it could be said that she offered resistance to a coercive population control program." Our court, not the IJ or the BIA, has taken the first shot at this question, which is just what we may not do.

## II. *Persecution*

The examination Li was subjected to, and the words spoken to her during the examination, of course repel us. I share the majority's doubt that this examination was a medically sound way to determine whether Li was pregnant. But the statute does not provide for asylum on account of crude medical practices. I cannot share the majority's certainty that the examination and statements made during it amount to persecution. While the record can be read that way by reasonable individuals such as my colleagues in the majority, it can also be read to the contrary, as it was by the reasonable judges in the majority on the three-judge panel, the Immigration Judge, and the members of the BIA. Where the record can be read in more than one way, the standard of review requires us to defer to the BIA's way. We can reverse only where the record "compels" a reasonable person to decide contrary to the BIA. I cannot agree that two of the three judges on our original panel, the Immigration Judge, and the BIA judges were not reasonable.

As an initial matter, Li did not say on direct examination that she came to the United States because she had been persecuted (she managed to give her attorney what he needed on redirect, but the IJ credited her "first and initial answer").[27] She said instead that she came so that she and her boyfriend could get married and get jobs:

Q. Why did you come to the United States?
A. Our intention was to come here, to get married, and then we find employment here in the United States.

---

24. Maj. Op. at 1161 n. 7.

25. E.R. at 68, 70, 70 (emphasis added). *See also id.* at 70 ("This Court will make a *finding* that whether it was 20 for female applicants and 22 for male applicants, the evidence would support a *finding* that there is some degree of flexibility in the enforcement of the law" (emphasis added)).

26. *Id.* at 72 (emphasis added).

27. E.R. at 61.

It was unlawful to get married in China.

Q. Okay. Were there any other reasons why you came to the United States?

A. But we were get married in China. That was unlawful, and that was considered as against the policy of the country.[28]

The crude pregnancy examination does not compel the interpretation that Li was persecuted. Though the medical technique was offensive and likely ineffectual for determining whether she was pregnant, there is nothing in the record to show that it was any different from standard Chinese village obstetric procedures. Being subjected to low medical standards to which everyone else is subjected regardless of race, religion, or political opinion is not persecution.

The majority's comparison to "rape"[29] seems overheated. Our state and county governments routinely force young children to suffer nonconsensual probing of their vaginas and anuses in child-abuse investigations.[30] We mandate other medical procedures as well, including degrading penile plethysmographs and insulting syphilis testing of those who wish to marry.[31] In light of what we do and accept routinely in the United States, we cannot say that a coerced obstetrical or gynecological examination *compels* a finding of persecution, even if such a finding would not be unreasonable.

We have said that persecution is an "extreme concept."[32] In *Prasad v. INS*, for example, soldiers in Fiji stopped an ethnic Indian cabdriver. He was jailed, questioned about his support for a particular political party, held four to six hours, and beaten.[33] We condemned these actions, but concluded that while "a reasonable factfinder *could* have found this incident sufficient to establish past persecution, we do not believe that a factfinder would be compelled to do so."[34] In *Hoxha v. Ashcroft*, the BIA addressed the asylum claim of an ethnic Albanian from Kosovo, who had testified to mistreatment extending back to his early childhood.[35] On one occasion, he was beaten by "Serbian vigilantes" who heard him speaking Albanian.[36] He suffered "extensive facial bruises and two broken ribs."[37] While we found the events he described "disturbing and regrettable," we held that "they do not evince actions so severe as to compel a finding of past persecution."[38] The BIA

---

28. *Id.* at 126–27.

29. Maj. Op. at 1158–1159 n. 4.

30. *See, e.g., Doe v. Lebbos*, 348 F.3d 820, 828–31 (9th Cir.2003); *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir.2000).

31. *See, e.g., Berthiaume v. Caron*, 142 F.3d 12 (1st Cir.1998); *Walrath v. United States*, 830 F.Supp. 444, 446 n. 1 (N.D.Ill.1993) (defining "penile plethysmograph"); Mass. Gen. Laws ch. 207, § 28A ("[A] certificate [of marriage] shall not be issued by the clerk or registrar under section twenty-eight until he has received from each party to the intended marriage a medical certificate signed by a qualified physician ... who has examined such party ... to ascertain the presence or absence of evidence of syphilis ....").

32. *Fisher v. INS*, 79 F.3d 955, 961 (9th Cir. 1996) (en banc); *see also Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir.1995).

33. *Prasad v. INS*, 47 F.3d 336, 339 (9th Cir. 1995).

34. *Id.* at 340.

35. *Hoxha v. Ashcroft*, 319 F.3d 1179, 1181 (9th Cir.2003).

36. *Id.* at 1184, 1181.

37. *Id.* at 1181.

38. *Id.* at 1182.

could permissibly conclude that, though different, the maltreatment of Li was no worse.

In addition to the coerced pregnancy examination, the majority takes the remarks made during it as compelling not just the conclusion that Li was persecuted, but also that she has a well-founded fear of future persecution. Here too, Li's burden is "a heavy one," and our review is supposed to be "extremely deferential." [39] Furthermore, any fear Li has of future persecution must be objectively reasonable.[40]

Here is what occurred in relation to the potential for future persecution, to the extent the record reveals it: Li was taken to the birth-control department of the village, and two nurses held her down while a doctor examined her vaginal area. Li testified that she was yelling during the exam—"Let me go. Let me go. Release me"—and "I was kicking my feet." [41] A doctor came over and "said stop yelling. If you keep on doing this, we will take you back any minute we want to give you examination. Anytime if you are found being pregnant, we will have the abortion performance taking place right away." [42] After the examination, they gave Li a document—exhibit 9—which says she had a "[u]rinal infection" [sic], but "[a]fter examination the patient is not pregnant." [43] She also testified that she was told, "If you are found, you know, you became pregnant, you are subject to the abortion, and then your boyfriend will be subject to the steri-

lization operation, and for the rest of your life, you will not have a child." [44]

Subsequently, Li and her boyfriend twice applied for marriage licenses. The legal ages of marriage were twenty for women and twenty two for men.[45] Li testified that in her opinion, the legal age for marriage should be fifteen. She said that when their applications were denied, "I decided this was not fair to us, and at that time we were deeply in love. So we make up our minds to declare our marriage." [46] Both families then sent out wedding invitations.

Li did not testify that she feared sterilization if she returned. Her boyfriend was threatened with sterilization, not her. She also did not testify that she feared forced abortion, with which she was threatened, if she returned. The threat that she would never have babies seems to have been connected to her boyfriend's sterilization and an implicit assumption by the official that Li would marry the boy and never have sexual intercourse with anyone else.

On this record, the BIA could have concluded that since Li and her boyfriend never did get married, in China or in the United States, her fear of jail for marrying underage was not well-founded. It could also have concluded that China is a big country, and Li and her boyfriend could avoid these particular brutish village officials by living somewhere else.[47] Or it could have concluded that, since Li and her boyfriend are now old enough to mar-

---

39. *Ghaly,* 58 F.3d at 1431.

40. *Prasad,* 47 F.3d at 338.

41. E.R. at 205.

42. *Id.* at 147.

43. *Id.* at 310.

44. *Id.* at 204.

· 45. Though the testimony varied on this point, the IJ appears to have concluded, consistent with the bulk of the evidence, that these were the requisite ages.

46. *Id.* at 207.

47. *Cf. Ventura,* 537 U.S. at 18, 123 S.Ct. 353 ("[A]n individual who can relocate safely within his home country ordinarily cannot qualify for asylum here.").

ry under Chinese law, they could do so without fear. As for the threats during Li's gynecological examination, the BIA could have concluded that both Li and the others were yelling whatever came into their heads, and that the threats were expostulations to get her to stop yelling and kicking during the medical examination, rather than serious statements of future intent. That conclusion would be bolstered by the conditional nature of the threats: *if* Li were found pregnant, she would be forced to abort and her boyfriend would be sterilized. Fortunately she was not pregnant, so neither occurred. Furthermore, as for the potential for arrest, Li's brother testified that there was an arrest warrant, but that it, too, was contingent on Li being found pregnant. The medical certificate said she was not pregnant, so that threat amounted to nothing. Now that the gynecological examination is long past, and they are both of age to marry, the BIA could have concluded that they have nothing to fear.

I do not suggest that the majority's conclusions are unreasonable or cannot be reached on this evidence. But the question before us is not whether the majority's conclusions are reasonable. Rather, it is whether they are compelled. They are not.

III. *Conclusion*

It is disgraceful that the government officials in Li's village subjected her to a degrading medical examination and subjected her and her boyfriend to talk of forced abortion and sterilization. The most disgraceful aspect is the inappropriate intrusion of government into such highly personal matters as love, sex, and childbirth. But China is a Communist country, and that disgrace may best be attributed, not to persecution, but to Communism. It may be that not too many people believe anymore in the old-time religion of Communism, but it is ossified in governmental structures and the relationship of government to people, and it is the only system of belief they have. The personal, in Communism, is supposed to be political.

The Chinese marriage law recites that "[l]ate marriage and late childbirth should be encouraged" [48] and "family planning shall be practiced," [49] as if it were any of the law's business. Mao Tse Tung wrote in *Combat Liberalism* that it is wrong "[t]o disobey orders and place personal opinions above everything" and to put "personal interests foremost and the interests of the revolution in the second place," [50] as young lovers are wont to do. "The bourgeois family," which Li and her boyfriend evidently wanted to start, "will vanish as a matter of course when its complement vanishes, and both will vanish with the vanishing of capital." [51] Marxists have favored "a new relation between instincts and reason," especially for "the most 'disorderly' of all instincts—namely sexuality," a goal which in the new Communist state would "*minimize* the manifestations of *mere* sexuality by integrating them into a far larger order, including the order of work." [52]

During the Cultural Revolution, love and marriage were condemned as fascist, and

---

**48.** Marriage Law of the People's Republic of China, Ch. II, Art. 5 (September 10, 1980), http://www.novexcn.com/marriate_law.html.

**49.** *Id.* at Ch. I, Art. 2.

**50.** Mao Tse Tung, *Combat Liberalism, in Essential Works of Marxism* 514, 515 (Bantam Classic ed.1961).

**51.** Karl Marx & Friedrich Engels, *The Communist Manifesto* 26–27 (International Publishers 1948) (1848).

**52.** Herbert Marcuse, *Eros and Civilization: A Philosophical Inquiry into Freud* 180, 181, 185 (1955) (emphasis in original).

the subsequent withdrawal from that insanity has been only partial—the Party has subsequently published propaganda on "How Youth Should Treat Love," in an attempt to " 'excite people to enthusiastically put their all into the program for the Four Modernizations.' " [53] The high age of marriage may be partly related to Chinese anti-natal policy, but it is very much related to Mao's doctrine that "it is of the utmost importance to arouse the broad masses of women to join in productive activity," [54] by which he meant industrial rather than natal production. Work first, marry later, propels more women into the labor force. This is not the same policy or practice as forced abortions and compelled sterilizations, for which our law provides asylum. The primary purpose of the somewhat high minimum age for marriage appears to be to assure that women join the labor force before marrying.

Our court is not in a position to change the ideology of the Communist Party of China, nor to afford a safe harbor to all those Chinese who chafe under it. There are only 1,000 asylum spots a year for those seeking it under the same provision to which Li appeals,[55] which arguably extended its succor only to those most brutalized by Chinese family policy. By broadening the grant to those who are most peripheral to this class, young lovers thwarted in their desire to marry, we may well be withdrawing American protection from those at the heart of it, persons subjected to forced abortions and sterilizations. The compassion felt by the majority risks a cruel irony of denial of compassion to those who need it most. The law requires us to avoid flirting with this risk

in this case by deferring to the administrative agency's determinations.

---

**53.** Steven W. Mosher, *Broken Earth: The Rural Chinese* 173 (1983).

**54.** Mao Tse Tung, *Women Have Gone to the Labour Front* (1955), http://www.marx-ists.org/reference/archive/mao/works/red-book/ch31.htm.

