[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 21, 2006
THOMAS K. KAHN
CLERK

_____

No. 06-10390
Non-Argument Calendar

_____

Agency No. A78-751-269

BLERIM HAXHILLARI,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(August 21, 2006)

Before BIRCH, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

Blerim Haxhillari, a citizen of Albania, petitions for review of the Board of Immigration Appeals' ("BIA") decision affirming the immigration judge's ("IJ") order denying asylum, 8 U.S.C. § 1158, and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(b)(3), and the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), 8 C.F.R. § 208.16(c). On appeal, Haxhillari argues that the IJ's findings that he did not establish eligibility for asylum, withholding of removal, or CAT relief are not supported by substantial evidence. We disagree and therefore DENY Haxhillari's petition.

## I. BACKGROUND

Haxhillari entered the United States on or about 12 January 2001, and, after inspection by an immigration officer, was not then admitted or paroled. According to an immigration officer's report on the I-213 form, Haxhillari stated that while in Albania, he had made plans to be smuggled into the United States for $6,000. Administrative Record ("AR") at 256. Because Haxhillari spoke Greek, he decided to obtain a false Greek passport. On 3 January 2001, he flew from Albania to Mexico. Haxhillari further explained that "his reasons for leaving Albania [were] the unemployment and harsh living conditions." Id. Haxhillari planned to travel to Detroit, Michigan, to locate his uncle and work there.

2

The Immigration and Naturalization Service ("INS")[1] subsequently issued

Haxhillari a notice to appear, charging him with removability, as an alien present

in the United States without being admitted or paroled. In December 2001,

Haxhillari filed an application for asylum and withholding of removal with the

INS. In the application, Haxhillari indicated that he left Albania on 27 December

2000. Haxhillari explained that he sought asylum because:

> my family and I were threaten[ed] that they will kidnap my youngest
> brother if we did not pay them money. I was working in Greece, so
> people were under the impression that I was making a lot of money so
> they wanted to take advantage of the situation. When I reported the
> incident to the police they did not take any action, [and] instead told
> us[,] ["C]an't you read at the bottom of the threatening letter that you
> should not contact the police[?"] Thus [the] police [were] supporting
> these people. Since such incidents happened several times I am afraid
> for my life.

Id. at 260. Haxhillari further indicated that his parents supported the Democratic

Party ("DP"), and that he and his family had been mistreated and threatened in

Albania based upon their memberships in a particular social group and their

political opinions. Specifically, Haxhillari stated that his "family was threatened

based [on] my parents' involvement in democratic party activities and local mob's

---

[1]The Homeland Security Act ("HSA"), effective 25 November 2002, created the Department of Homeland Security ("DHS") and abolished the INS. Pub. L. No. 107-296, 116 Stat. 2135. The HSA transferred INS functions to the DHS. This case was initiated while the INS was still in existence. This opinion, therefore, refers to the INS rather than the DHS as the relevant agency.

suspicion that I was making a lot of money." Id. at 261. He also asserted that his

brother, Urim Haxhillari, after going to the police station to report the receipt of

threatening letters, had been arrested and detained for 24 hours. Haxhillari's

mother also went with Urim to the police station and "police misbehaved with

[her]." Id. Discussing his trip from Albania to the United States, Haxhillari

indicated that he spent a couple of hours each in Hungary, France, Belgium, and

Spain before he arrived in Mexico, where he spent two weeks prior to entering the

United States.

Haxhillari appeared for his initial removal hearing in August 2001 and

conceded removability. At his final removal hearing, Haxhillari testified that he

lived in Albania from his birth in 1980 until June 1996, when he moved to Greece

at "the will of [his] parents." Id. at 90-92. He returned to Albania in November

2000 to visit his family. Haxhillari indicated that his family began having

problems in Albania during the election in October 2000. During that election,

Haxhillari's father was a member of the election commission for the DP and was

an election observer in Tirane, Albania. His father joined the DP in December

1990 and people supported by the Socialist Party ("SP") arrested him twice during

the 2000 election campaign.[2] Haxhillari testified that his father was detained for

---

[2]Haxhillari first testified that his father "was arrested several times." AR at 95. Upon further questioning, however, Haxhillari specified that his father was arrested twice. Id. at 96.

4

24 hours during each arrest, was beaten, and was ordered to stop supporting the DP.

Haxhillari further testified that the next problem occurred on 9 December 2000, when "unknown persons" sent him a letter stating that, if he did not "pay a certain amount of money," he or his brother would be kidnaped or killed. Id. at 98. Haxhillari's mother and brother then went to the police to report the letter, and the police told them to "come another time because we have bigger problems to take care of." Id. at 99-100. On 13 December 2000, Haxhillari's mother and brother again went to the police because his mother "was terrorized from this letter and she was very scared for her children." Id. at 100-01. During this meeting, the police made jokes and asked Haxhillari's mother whether she noticed that at the bottom of the letter, it stated not to contact the police. The police then "used force" to remove Haxhillari's mother from the premises, which made Haxhillari's brother angry. Id. at 101. The police next hit Haxhillari's brother and detained him for two days. Haxhillari stated that his brother was not charged with any crime because the police did not have any facts.

On 15 December 2000, Haxhillari began walking to the police station because he hoped, but he did not know for certain, that his brother would be released that day. While Haxhillari was walking, five masked men stopped next to

him, got out of the car, and beat him. Haxhillari stated that he knew the masked men were the same men who sent him the threatening letter because "they said that you are a smart fellow. You are the one who reports us to the police." Id. at 105-06. After the beating, witnesses took Haxhillari to the police station where he filed a report, and then he went to the hospital. Haxhillari testified that his father mailed him the original police report of the incident, which he submitted into evidence, and that the report was dated 10 February 2002. Haxhillari was hospitalized for ten days following the beating. He left the hospital on 25 December 2000, and began his trip to the United States on 27 December 2000 because he feared for his life.

Haxhillari also testified that, in addition to his father, his mother, two brothers, and he were members of the DP. According to Haxhillari, he joined the DP on 20 January 1996, as a member of the youth branch. Haxhillari stated that at the time he joined the DP, he paid his membership contributions in full for the five years that followed; specifically, he paid $12 in 1996 and he was paid up until 2000. He also stated that the monthly contribution at that time was approximately 20 cents. Haxhillari further testified that his parents still live in Albania, but his brothers moved to Italy two or three days after he left for the United States.

On cross-examination, the government asked Haxhillari why he indicated on his asylum application that his brother had been arrested, but not that his father had also. Haxhillari responded that,

> the arrest[s] that were made during the election time in one day they arrested two, 300 people in the days that, of the, of the meetings. And, and they were beaten and they were (indiscernible). That was the job that they were doing . . . . Not that I didn't think that this was not important but since this was something that happened so often with so many Albanians at the time I thought it was not important.

Id. at 122-23. Haxhillari also stated that the police kept the letter that he received on 9 December 2000. The government then asked why he testified that his brother was released from jail on 15 December 2000, but that his asylum application, the letter from his brother, and the police report each indicated that his brother was released on 14 December 2000. Haxhillari replied, "I don't know how they call the morning of the [sic] December the 15th, or the night of the 14th." Id. at 126. Haxhillari provided the following testimony with regard to his failure to state on his asylum application that he had been beaten on 15 December 2000:

> Haxhillari: I didn't mention that because when I was stopped in the border of California I was still (indiscernible). I was very scared and I didn't know. I was saying what is happening with me.
> Government: But your asylum application was not filled out when you crossed the border was it?
> Haxhillari: When I, when I came here I asked for help from other people because I didn't know any, any English and I don't know when or where.
> Government: Your asylum application was signed and dated by you on November the 30th, 2001.

7

Haxhillari: Yes, but I couldn't already, and I couldn't know in details what was (indiscernible) in that.

. . .

Government: When you first encountered U.S. Immigration officials near El Centro, California, on January the 12th, 2001, were you asked why you left Albania?

Haxhillari: They, they asked me but I didn't know. I left that country where I was terrorized and I came here and I was going to go in prison without doing anything and I was very confused and scared.

Government: Did you tell the Immigration official that your reason for leaving Albania was the unemployment and the harsh living conditions?

Haxhillari: I told them that I had problems. I feared for my life. But with me at that time it was us and other Albanian and they were translating for him and me from Greek language because they couldn't find any Albanian, from the same person. And we didn't know the rules so we were speaking in the same time so these words might have been his words.

Id. at 126-28. Haxhillari stated that he spoke Greek, but that he could not read or write it.

In support of his application Haxhillari submitted the following documents: (1) a copy of his DP monetary contribution booklet, which indicated that Haxhillari paid dues from February 1996 until December 2000, id. at 166-75; (2) a letter from Haxhillari's brother stating that he was in jail from 13 December to 14 December 2000, and that "after they released me in the morning of December 15, 2000, I learned that my brother Blerim Haxhillari was beaten, mistreated, and injured[,]" id. at 158-62; (3) a verification from the Albanian police department, dated 10 February 2002, indicating that Haxhillari's brother "has been stopped [by] the

8

justice police department . . . from December 13, 2000 until December 14, 2000. This verification is issued per his request[,]" id. at 152-56; and (4) a verification from the Albanian police department, also dated 10 February 2002, indicating that Haxhillari "is reported to the Justice Police Department of the Prefecture of Tirana, mistreated from unknown persons. The identification of these persons has not been possible by the police. This verification is issued per his request[,]" id. at 146-50.

The 2001 State Department Country Reports on Human Rights Practices in Albania ("Country Report") indicated that the DP credibly alleged incidents of political killings and police harassment. The police also "arbitrarily arrested and detained persons." Id. at 182-83. However, "[t]here were no confirmed cases of political killings by the Government, despite repeated claims by the DP that its members were harassed, beaten, and sometimes killed by government agents." Id. at 183. The 2004 Country Report indicated that the elections held in October 2003 were an improvement over past elections, with "few isolated incidents of irregularities and violence." Id. at 195. With regard to police and security, the Country Report stated that "[s]ome members of the security forces committed human rights abuses." Id. The administrative record also includes the 2004 United States Department of States Profile of Asylum Claims and Country Conditions concerning Albania ("Profile"). The Profile stated that, since 1998,

9

"there have been no major outbreaks of political violence . . . and . . . neither the Government nor the major political parties engage in policies of abuse or coercion against their political opponents." Id. at 215.

The immigration judge ("IJ") denied Haxhillari's applications and ordered him removed to Albania. In an oral decision, the IJ concluded that Haxhillari had failed to establish credibly that he had suffered past persecution or had a well-founded fear of future persecution if returned to Albania. The IJ found the following material inconsistencies between Haxhillari's testimony and his asylum application: (1) Haxhillari indicated in his application that only his mother and father were supporters of the DP, but he testified that he, his brothers, and his parents were members of the DP; (2) Haxhillari never mentioned in his application that his father was an active member of the DP or that his father participated in the elections as an observer; (3) Haxhillari's application did not indicate that his father had been arrested and beaten several times due to his father's participation in the DP, and Haxhillari did not provide a reasonable explanation for why he failed to mention those facts in his application; (4) Haxhillari did not report in his application that he had also been beaten in Albania; (5) during cross-examination, Haxhillari stated that he omitted his beating in his application because he was scared when he was stopped at the border, but the IJ found that Haxhillari did not sign his asylum application until he was residing in the United States; (6)

Haxhillari did not specify in his application that he received a letter that demanded that he pay money or risk being kidnaped, nor did he identify specific letters that led to the incidents that occurred on 13 December and 15 December 2000; and (7) Haxhillari's application did not indicate that he received threatening letters from masked men.

The IJ further noted the following inconsistencies and incredible claims: (1) the IJ questioned Haxhillari's claim that he became a member of the DP in January 1996, because the IJ found that Haxhillari "was still under age at the time he joined the party and would have most likely joined a youth branch of the [DP] and not the national [DP] as alleged by [Haxhillari,]" id. at 58-59; (2) concerning Haxhillari's DP contribution booklet, the IJ determined that contrary to Haxhillari's claim that he paid his dues up-front for a five-year period, the booklet indicated that Haxhillari made a payment each month, and, moreover, the IJ noted that the seal on the original documents faded as the pages spanned from 1996 through 2000; (3) the IJ doubted Haxhillari's true identity because he held a false passport and admitted that he paid $6,000 to be smuggled into the United States; (4) Haxhillari's application and testimony conflicted with the immigration officer's report on the Form I-213, which indicated that Haxhillari stated that he left Albania due to the "unemployment and harsh living conditions[,]" id. at 60; (5) the IJ also found that Haxhillari's application indicated that his brother had been held in jail for 24 hours

and the documentary evidence stated that his brother was held from 13 December until 14 December 2000, but Haxhillari testified that he went to see his brother at the police station on 15 December 2000; (6) the IJ doubted that Haxhillari went to the police to report his beating on 15 December 2000 because his brother had just been jailed for complaining to the police; (7) Haxhillari did not provide any medical documentation of his alleged stay in the hospital following his beating on 15 December 2000; and (8) the IJ noted that even though Haxhillari testified that he had been warned during his beating to stop supporting the DP, he had not participated in any DP activities from June 1996 through November 2000.

Based on the above-mentioned findings, the IJ denied Haxhillari's asylum application "for lack of credibility and lack of proof." Id. at 64. The IJ further determined that, because Haxhillari failed to meet the stricter asylum standard, he also did not meet his burden with regard to withholding of removal. Finally, the IJ found that Haxhillari did not establish a credible claim for relief under the CAT.

Haxhillari appealed the IJ's decision to the BIA, arguing that (1) the IJ findings of fact were clearly erroneous, (2) the inconsistencies the IJ noted were not material and did not warrant an adverse credibility finding, (3) the IJ's findings, that Haxhillari did not establish past persecution, a fear of future persecution, or eligibility for relief under the CAT, were erroneous. In his brief before the BIA, Haxhillari argued that he had provided "a convincing explanation

12

for the discrepancies and omissions" between his testimony and his application concerning his and his family's memberships in the DP. Id. at 15-16. Haxhillari also contended that he admitted that he had been a member of the youth DP and that the IJ had no reason to question the reliability of his DP membership contribution booklet. He further noted that his credibility did not turn on whether he presented a false document at the border. The BIA affirmed, without opinion, the IJ's decision.

## II. DISCUSSION

On appeal, Haxhillari argues that the IJ's findings that he did not establish eligibility for asylum, withholding of removal, or CAT relief are not supported by substantial evidence. We address each issue in turn.

A. Asylum

Haxhillari argues that he had established that he suffered past persecution because of his membership in the DP. He further maintains that the IJ's findings regarding his credibility were not sufficiently specific and were incorrect. He also addresses many of the IJ's specific findings regarding his credibility: (1) he did mention his family's support of the DP in his asylum application and, at the hearing, he merely explained and supplemented that basic information; (2) concerning his father's arrest and beatings, he did mention in his application that his family had been threatened as a result of their participation in the DP, and

13

his testimony only supplemented his application; (3) the statement, that "[b]ased on the past persecution in the hands of the local[] police . . . I have a firm belief that I will be tortured," id. at 262, from his application sufficiently referenced his beating to which he testified at his hearing; (4) the IJ's finding that Haxhillari was too young to be a member of the DP is not supported by evidence of an age restriction for DP membership; (5) the IJ criticized the authenticity of his DP membership booklet, but those findings were based on conjecture and speculation; (6) his statement to the immigration officer at the border, that he left Albania because of unemployment and harsh living conditions, was consistent with the concept of political persecution; (7) the inconsistency between his I-213 form and his testimony concerning the date he left Albania is an immaterial confusion of dates; (8) it was not essential that Haxhillari provide the threatening letter that he received; (9) the record's confusion on the issue of whether Haxhillari's brother was detained until either 14 or 15 December is not sufficient grounds upon which to base an adverse credibility finding; (10) the IJ's determination that it was unlikely that Haxhillari would go to the police to report his beating was not supported by the evidence; (11) the fact that Haxhillari did not present medical documents relating to his stay in the hospital is not dispositive; and (12) the fact that Haxhillari presented a false passport is also not dispositive of the issue of his credibility.

14

When the BIA issues a decision, we review only that decision, except to the extent the BIA expressly adopts the IJ's decision. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). "Insofar as the [BIA] adopts the IJ's reasoning, we will review the IJ's decision as well." Id. Here, the BIA affirmed the IJ's findings without opinion. Therefore, we will review the decision of the IJ as the final agency determination.

To the extent that the IJ's and the BIA's decisions were based on legal determinations, our review is de novo. D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 817 (11th Cir. 2004). The IJ's and BIA's factual determinations are reviewed under the substantial evidence test, and we "must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Al Najjar, 257 F.3d at 1283-84 (quotation omitted). Therefore, a finding of fact will be reversed "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal . . . ." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc), cert. denied, 544 U.S. 1035, 125 S. Ct. 2245 (2005); see also 8 U.S.C. § 1252(b)(4)(B) ("[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary . . . ."). Likewise, a credibility determination is reviewed under the substantial

15

evidence test, and "this [c]ourt  may not substitute its judgment for that of the BIA

with respect to credibility findings." D-Muhumed, 388 F.3d at 818.

To establish eligibility for asylum, an applicant has the burden of proving

that he is a "refugee," which is defined as:

> any person who is outside any country of such person's nationality or,
> in the case of a person having no nationality, is outside any country in
> which such person last habitually resided, and who is unable or
> unwilling to return to, and is unable or unwilling to avail himself or
> herself of the protection of, that country because of persecution or a
> well-founded fear of persecution on account of race, religion,
> nationality, membership in a particular social group, or political
> opinion

8 U.S.C. §§ 1158(b)(1), 1101(a)(42)(A); see also Forgue v. U.S. Att'y Gen., 401

F.3d 1282, 1286 (11th Cir. 2005).

Additionally, to establish asylum eligibility through a well-founded fear, an

applicant must prove that his statutorily protected status will cause harm or

suffering that "rises to the level of persecution." Forgue, 401 F.3d at 1286

(quotations omitted).  "In order to demonstrate a sufficient connection between

future persecution and the protected activity, an alien is required to present

specific, detailed facts showing a good reason to fear that he or she will be singled

out for persecution on account of such a protected activity." Id. (quotation

omitted).  "Establishing a history of past persecution creates a presumption that an

16

alien has a well-founded fear of future persecution, although that presumption can be rebutted by the government." Id.; see also 8 C.F.R. § 208.13(b)(1).

"The testimony of an applicant, if found to be credible, is alone sufficient to establish" eligibility for asylum.[3] Id. at 1287 (citing, inter alia, 8 C.F.R. §§ 208.13(a), 208.16(b), which, respectively, refer to asylum and withholding of removal). Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishment as the applicant repeatedly recounts his story. See In re B-, 21 I. & N. Dec. 66, 70 (BIA 1995); see also Dailide v. U.S. Att'y Gen., 387 F.3d 1335, 1343 (11th Cir. 2004) (affirming the BIA's adverse credibility determination, which was based upon its finding that the applicant's testimony conflicted with his answers to interrogatories, affidavit, deposition, and other documentary evidence). Although uncorroborated but credible testimony may be sufficient to sustain an applicant's burden of proving eligibility for asylum, "[t]he weaker an applicant's testimony, however, the greater the need for corroborative evidence." Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005). The IJ must make "clean determinations of credibility." Id. (quotations omitted). Further, "an adverse

---

[3]The REAL ID Act amended, among other things, the judicial review of credibility determinations. See REAL ID Act of 2005, Pub. L. 109-13, Div. B, 119 Stat. 231 (May 11, 2005). However, those amendments do not apply to applications filed prior to 11 May 2005, the effective date of the amendments. Therefore, because Haxhillari's application for asylum was filed prior to 11 May 2005, the REAL ID Act does not apply to this case.

credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant," and the IJ must provide "specific, cogent reasons" for its credibility finding. Forgue, 401 F.3d at 1287. Nevertheless, when the IJ enumerates an applicant's inconsistencies and is supported by the record, "we will not substitute our judgment for that of the IJ with respect to its credibility findings." D-Muhumed, 388 F.3d at 819.

In Haxhillari's case, substantial evidence supports the IJ's finding that Haxhillari was not credible, and, thus, did not establish his eligibility for asylum. With regard to Haxhillari's I-213 form, asylum application, and hearing testimony, there are several inconsistencies in the record. First, Haxhillari added significant facts at his hearing that were not included within his application. In response to the question of whether he or members of his family had belonged to political groups in Albania, Haxhillari replied that his "parents supported the democratic party." AR at 261. Further, in response to whether he or his family had ever been mistreated or threatened in Albania, Haxhillari stated that his "family was threatened based [on] my parents' involvement in democratic party activities and local mob's suspicion that I was making a lot of money." Id. He also mentioned only his brother's arrest in response to the question of whether he or his family had been detained or arrested in Albania. However, at his hearing, Haxhillari testified that his father had been arrested and beaten several times, and that he had been

18

beaten once.  Id. at 96-97, 105-06.  Haxhillari's argument on appeal as to why he did not mention those incidents in his application is that his application was a "bare bones" account, and that his testimony supplemented the application.  Appellant's Br. at 17-19.  Even accepting Haxhillari's argument, the fact remains that in response to direct questions concerning his and his family's involvement in political parties, arrests, and beatings, Haxhillari failed to offer information concerning events material to his claim of political persecution.

Second, Haxhillari testified that, beginning in 1996, he paid his DP contributions in-full for the following five years.  However, as the IJ noted, Haxhillari's contribution booklet indicated that he made monthly payments during those five years.  Haxhillari's explanation does not compel us to reverse the IJ's seemingly reasonable interpretation of the evidence.  See Adefemi, 386 F.3d at 1027.  Third, the immigration officer's report on the I-213 form stated that Haxhillari informed the officer that he left Albania due to the unemployment and harsh living conditions there.  AR at 256.  While Haxhillari's argument that "harsh living conditions" is not inconsistent with his claim of political persecution is somewhat correct, the fact that Haxhillari did not mention the beating he allegedly sustained just sixteen days prior to his interview with the immigration officer, in combination with the other inconsistencies in the record, support the IJ's conclusion that Haxhillari's later-stated reason for leaving Albania was not

credible. Fourth, Haxhillari did not provide any medical documentation as to his hospitalization on 15 December, even though, as the IJ noted, Haxhillari's father had mailed him other documentation with regard to his case. Id. at 110-11; see also Yang, 418 F.3d at 1201 (although uncorroborated but credible testimony may be sufficient to sustain an applicant's burden of proving eligibility for asylum, "[t]he weaker an applicant's testimony, however, the greater the need for corroborative evidence").

Nonetheless, some of the IJ's findings are not supported by record evidence. Specifically, the IJ doubted Haxhillari's membership in the DP entirely because of Haxhillari's age at the time he claimed that his membership began. AR at 58-59. However, Haxhillari testified that he was a member of the youth branch of the DP, and, moreover, the IJ did not point to any record evidence supporting its conclusion that the DP has age restrictions. See id. at 115. Further, the IJ stated that Haxhillari did not mention the threatening letter in his asylum application. Id. at 61. This conclusion is contradicted by Haxhillari's statement in his application that,

> my family and I were threaten[ed] that they will kidnap my youngest brother if we did not pay them money. I was working in Greece, so people were under the impression that I was making a lot of money so they wanted to take advantage of the situation. When I reported the incident to the police they did not take any action, instead told us [,] can't you read at the bottom of the threatening letter that you should not contact the police[?] Thus [the] police [were] supporting these

20

people.  Since such incidents happened several times I am afraid for my life.

Id. at 260 (emphasis added).

However, the IJ's errors, including any unwarranted emphasis on minor discrepancies with dates, do not overwhelm the many material inconsistencies that the IJ correctly identified in the record.  Thus, the IJ's finding that Haxhillari was not credible is supported by substantial evidence.  Further, the remaining record evidence does not compel reversal.  See Adefemi, 385 F.3d at 1027 (noting that "the mere fact that the record may support a contrary conclusion is not enough to justify a reversal").  In addition, most of the State Department information indicated that conditions in Albania for DP members had improved since Haxhillari's departure.  See AR at 195, 215, 217.  As such, the IJ's determination that Haxhillari did not establish his eligibility for asylum is also supported by substantial evidence.

B.  Withholding of Removal

Haxhillari argues on appeal that, for the reasons he stated with regard to his eligibility for asylum, he is likewise eligible for withholding of removal.  He also contends that because he faced past persecution in Albania, we should presume that he will suffer future persecution if he returns.

To establish eligibility for withholding of removal, the applicant must meet a standard more stringent than the "well-founded fear" asylum standard, and "show that h[is] life or freedom would 'more likely than not' be threatened upon return to h[is] country because of, among other things, his political opinion." Huang v. U.S. Att'y Gen., 429 F.3d 1002, 1010-11 (11th Cir. 2005) (per curiam) (citing Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003) and 8 U.S.C. § 1231(b)(3)(A)). Thus, an applicant who is unable to meet the standard for asylum is also unable to meet the more stringent standard for withholding of removal. Huang, 429 F.3d at 1011 (citing Al Najjar, 257 F.3d at 1292-93). Because Haxhillari failed to meet the asylum standard, his claim for withholding of removal also fails.

C. CAT Relief

Haxhillari argues on appeal that he is entitled to CAT relief because he has been tortured in the past and that if he returns to Albania, it is more likely than not that he will suffer future persecution by members of the Socialist Party ("SP").

An alien is entitled to withholding of removal under the CAT if he shows that it is "more likely than not that he will be tortured" upon his return to his home country. 8 C.F.R. § 208.16(c)(2); see also Cadet v. Bulger, 377 F.3d 1173, 1180 (11th Cir. 2004). "Torture" is "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by or at the instigation

of . . . a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). "Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." 8 C.F.R. § 208.18(a)(2). An applicant that cannot establish eligibility for asylum also cannot meet the higher burden of establishing eligibility for relief under the CAT. See Al Najjar, 257 F.3d at 1303-04.

As explained above, the IJ's determination that Haxhillari and his various accounts concerning the threats and beatings that he and his family sustained in Albania were incredible is supported by substantial evidence. Moreover, Haxhillari does not point to any other treatment that he received that was found credible and could amount to "torture" as defined in the regulations. Thus, the IJ's denial of CAT relief was supported by substantial evidence.

### III. CONCLUSION

Upon review of the record, and consideration of the parties' briefs, we conclude that there is substantial evidence to support the IJ's findings that Haxhillari did not establish eligibility for asylum, withholding of removal, or CAT relief. Accordingly, we deny Haxhillari's petition for review.

**PETITION DENIED.**