**[PUBLISH]**

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 8, 2005
THOMAS K. KAHN
CLERK

_____

**No. 04-15455**
**Non-Argument Calendar**

_____

BIA No. A79-093-873

YUN YAN HUANG,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

**Petition for Review of an Order of the**
**Board of Immigration Appeals**

_____

**(September 8, 2005)**

Before ANDERSON, WILSON and FAY, Circuit Judges.

**PER CURIAM:**

Yun Yan Huang, a Chinese national proceeding through counsel, petitions for review of the Board of Immigrations Appeals' ("BIA") affirming the Immigration Judge's ("IJ's) order of removal and denial of her asylum and withholding of removal claims as well as her claim under the United Nations Convention Against Torture ("CAT"). She argues that (1) the BIA's opinion is unreviewable because it failed to provide any reasoning for its decision and (2) substantial evidence supported her asylum claim for refusing to submit to an intrusive physical examination conducted as part of China's family planning policies. For the reasons stated more fully below, we deny the petition.

According to a notice to appear issued on May 16, 2002, Huang entered the United States on or about May 1, 2002, and was charged with removability for being an immigrant who is not in the possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document, INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I). On February 27, 2003, Huang filed an application for asylum and withholding of removal, alleging persecution on account of her political opinion, and relief under CAT.

Huang's application for asylum and withholding of removal alleged the following: (1) in August 2001, the local family planning authority required her to attend a gynecological checkup and, during her examination, a male doctor touched her breasts and her "private part" causing her great pain; (2) she was

2

ordered to a second checkup, which she refused to attend, and was thereafter detained by family planning agencies for 26 days; and (3) her mother was forced to accept sterilization by the local family planning authorities. Huang also stated that she feared returning to China because she would again be forced to attend mandatory checkups and, if she refused, would again be detained or face even more serious punishment. As to her fear of torture, Huang repeated that she would be forced to attend gynecological checkups and, during her first checkup, a male doctor caused her pain and discomfort while touching her breasts and "private parts."

Huang included with her application a "Personal Statement." In it, Huang stated that she was a 20-year-old single lady who refused to attend a family planning physical checkup, the purpose of which was to humiliate women and trespass on their privacy, resulting in a one-month detention. She described how her parents wanted additional children, and she was forced to live with relatives to avoid attention from the family planning office, although her mother was forcibly sterilized on March 11, 1990, after the birth of her youngest sister.

Huang stated that, in August 2001, at age 18, she was required to attend a mandatory gynecological exam designed to prevent pregnancies before marriage. She repeated her description of a male doctor rudely touching her breast and "private part" and stated that, after the exam, she hated the Chinese government's

3

family planning policy. In December 2001, Huang refused to attend her mandatory checkup, resulting in a detention of 26 days where government officials yelled at her and, eventually, she became scared of that lifestyle and wanted to leave China.

Also in the record is a letter purporting to be from her father, Jin Guan Huang. He explained that Yin Yan Huang was his first-born daughter and he had made arrangements for her to live in his relatives' homes so that he and his wife could have a second child without drawing attention from the family planning department. His wife then became pregnant with a third child, and this time the family planning department discovered the pregnancy, forcing the Huangs to leave home in order to protect their unborn child. The family planning department could not find them at home and, in retaliation, closed down Jin Guan Huang's store. After the third child was born, Jin Guan and his wife turned themselves in to avoid more government persecution, and his wife was forced to undergo sterilization. He also stated that Yin Yan Huang was forced to undergo a periodical gyynecological exam when she turned 19, and a male doctor did things to her that made her feel humiliated and trespassed upon. Finding the checkups unbearable, she refused to go, was detained for a month, and then left China.

Next the record contained a "Family Planning Register Card" for Lan Ying Li, indicating that, on March 11, 1990, a female sterilization was performed. The next exhibit was a "Registration Card" from the "Single Young Lady Birth Control

4

School" issued in the name of Yun Yan Huang, born December 1983. Finally, a birth certificate was included, indicating that a Huang Yun Yan was born on December 2, 1983, in Fujian Province to Huang Jin Guan (father) and Li Lan Ying (mother).

Also included in the administrative record was the State Department's China Country Report on Human Rights Practices, issued March 31, 2003. Relevant to Huang's claim, the Chinese government implemented a new "Population and Family Planning" law on September 1, 2002, intending to standardize the implementation of the "birth limitation" policies in the local provinces. The new law required counties to use quotas or other measures to limit the total number of births in each county, as well as requiring married couples to apply for permission to have a second child if they meet the stipulated requirements of the local provinces, which sometimes requires as many as four years between pregnancies. China's population control policy relies on education, propaganda, and economic incentives, as well as more coercive measures such as the threat of job loss or demotion, and those who have unapproved children are subject to a "social compensation fee." In at least one province, the rules state that "unplanned pregnancies must be aborted immediately." However, the central government policy formally prohibits the use of physical coercion to compel persons into abortion, and under the "state compensation law," citizens may sue officials who

5

exceed their authority in implementing birth planning policy.

Huang conceded to the allegations and charge of removability at a master hearing. At her asylum hearing, Huang indicated that she left China on December 29, 2001, and arrived in the United States on May 1, 2002. At the time of her hearing, Huang remained unmarried with no children. Huang testified that she came to United States seeking political asylum because she could not accept China's policies requiring any female under the age of 18 to be examined, allowing females to have only one child, and forcing females to have abortions if they have more than one child. When she was 18, Huang became aware of the law because the Chinese government requested that she appear for a "whole body" checkup in August 2001. During her checkup, a male asked her to unbutton her shirt, used his hand to touch her breast and squeeze her nipples, and then touched her vagina without using gloves, all of which caused her pain. Three days later, her breasts and nipples became swollen.

Huang's next scheduled appointment was on December 1, 2001, and this time she did not attend because of what happened to her during her first checkup, resulting in her arrest for violating the family plan policy. She was not tortured or forced to do anything while in detention, but testified that she was asked to submit to an examination and write a letter of repentance. It cost Huang $30,000 to come to the United States, with a $3,000 down payment. The IJ then questioned Huang

6

regarding how old she was in August 2001, to which Huang replied that she was 19 according to the "Chinese calendar," but only 17 according to the official calendar because her birth date was December 2, 1983. Huang then indicated that she remained in a detention center from December 2 through December 25, when her father obtained her release and she went into hiding at a co-worker's house before leaving the province and heading for the United States.

If returned to China, Huang testified that she did not want to undergo any examinations or be forcibly sterilized like her mother. She testified that she wanted to have more than two children, although at the time of her hearing, she was not married, did not have a boyfriend or fiancé, and had never had a child. Huang also testified regarding a piece of paper purporting to be from a birth control school, stating that, on August 10, 2001, the date of her first checkup, she was told to bring that document and, after receiving her examination, received school training. The IJ then stated, for the record, that the Chinese government uses education to further its family planning policies, and clarified that Huang had to have a physical exam at the family planning school before going to class.

The IJ also questioned Huang regarding how she was able to pay her way to the United States. Huang testified that she borrowed $3,000 from her co-workers to pay a deposit to a "leader" who ultimately purchased her plane ticket. Huang also testified that, after she fled China, she first went to Thailand, but did not apply

7

for asylum there because she was controlled by the "leader," and also traveled to Cambodia, where she stayed for three months without applying for asylum. Next, the IJ questioned Huang about her family registry, specifically regarding the fact that only one child was listed in it, raising a question as to how the Chinese authorities could have known that Huang's mother had more than one child. Huang responded that the government was suspicious and forced her mother to undergo sterilization in 1990. Lastly, the IJ expressed her opinion that Huang's application was not credible and bordered on frivolous, but that she would not render a finding of frivolity because of Huang's age.

The IJ issued an oral decision, finding that, while a person forced to abort a pregnancy or undergo involuntary sterilization or who has been persecuted for failing to undergo such procedures meets the statutory definition for persecution on account of political opinion, Huang's case was not such a case. The IJ found that Huang had been required to attend a gynecological exam that was conducted in a rough matter even though she had not yet turned 18 years of age. She refused to go for a second exam, was detained for 20 days, and then four days later left China for a "voyage of several months around the world" before arriving in the United States. The IJ questioned her father's letter, as it contained statements that were untrue and inconsistent with Huang's testimony, and it found that Huang had attended a birth control school that appeared to be a part of the educational

program for young people in China. Based on Huang's testimony regarding the "family registry," the IJ found that it was unclear how the Chinese government could have believed that Huang's parents had violated the family planning policy or that her parents' past violation resulted in her receiving a crude gynecological exam at the age of 17. In short, the IJ found that "[t]his case makes absolutely no sense," and that while background materials for China indicate a history of forced family planning procedures such as IUD insertion and sterilization, none of it applied to Huang. The IJ further found that it was "ludicrous" to believe that, after 20 days of detention, Huang was released to her family and, after four days, gathered an extremely large sum of money and made arrangements for her travel to the United States. Thus, the IJ denied Huang's application for asylum, withholding of removal, and relief under the CAT.

> The BIA issued a written per curiam opinion stating the following: Even accepting the respondent's claim as credible, she still would not meet her burdens of proof for asylum, withholding of removal, or protection under the Convention Against Torture. We further note that the decision of the United States Court of Appeals for the Ninth Circuit cited by the respondent on appeal was decided on different facts in a case arising in a different circuit than the present case. Accordingly, the appeal is dismissed.

On appeal, Huang first argues that the BIA's decision is incapable of review because it does not adopt the IJ's reasoning, but rather simply gives a conclusion that Huang could not meet her burdens of proof, which she argues is

9

impermissible. Without an explanation of the BIA's reasoning, Huang argues that we must vacate the decision.

Huang does not cite to a single statute, regulation, or case to support her argument. In any event, the BIA's decision specifically mentions that Huang, even if credible, could not meet her burdens of proof. Thus, the BIA's reasoning is self-evident in its decision: upon review of the evidence, it found that the facts, as Huang alleged them, did not satisfy her burdens of proof with respect to asylum, withholding of removal, or CAT. Furthermore, all of her evidence, including her testimony at the removal hearing, is present on the record with which the BIA made its decision, providing us with what we need to review whether the BIA's decision was supported. See INA § 242(b)(4)(A), 8 U.S.C. § 1252(b)(4)(A).[1] Accordingly, we conclude that the BIA's decision is reviewable as written and turn to Huang's argument that substantial evidence supported her claim of asylum.

Huang argues that she meets the standards of a political refugee pursuant to INA § 101(a)(42), 8 U.S.C. § 1101(a)(42) as a person persecuted for "other resistance to a coercive population program" because she refused to submit to intrusive physical examinations conducted as part of China's family planning

---

[1] Providing that: "[T]he court of appeals shall decide the petition only on the administrative record on which the order of removal is based."

10

policies and was detained for 20 days because of her refusal.[2]  She cites this Court

to <u>Li v. Ashcroft</u>, 356 F.3d 1153 (9th Cir. 2004).

Because Huang's removal proceedings commenced after April 1, 1997, the

effective date of IIRIRA, this case is governed by the permanent provisions of the

INA, as amended by IIRIRA.[3]  <u>Gonzalez-Oropeza v. U.S. Attorney Gen.</u>, 321 F.3d

1331, 1332 (11th Cir. 2003).  We will review only the Board's decision, except to

the extent that it expressly adopts the IJ's opinion.  <u>Al Najjar v. Ashcroft</u>, 257 F.3d

1262, 1284 (11th Cir. 2001) (citation omitted).

To the extent that the BIA's decision was based on a legal determination,

review is <u>de novo</u>.  <u>Mohammed v. Ashcroft</u>, 261 F.3d 1244, 1247-48 (11th Cir.

2001).  The BIA's factual determinations are reviewed under the substantial

evidence test, and we "must affirm the BIA's decision if it is 'supported by

reasonable, substantial, and probative evidence on the record considered as a

whole.'"  <u>Al Najjar</u>, 257 F.3d at 1283-84 (citation omitted).  Thus, factual

---

[2] Huang does not make any argument regarding her eligibility for relief under the CAT and, therefore, the issue is deemed abandoned.  <u>Sepulveda v. United States Attorney Gen.</u>, 401 F.3d 1226, 1228, n.2 (11th Cir. 2005).

[3] The date on which a petition is filed is no longer important, as Congress has now directed that all petitions for review will be governed under the permanent provisions of IRIIRA. <u>See</u> REAL ID Act of 2005, Pub. L. 109-13, 119 Stat 231 (May 11, 2005) (providing that a petition for review "filed under former section 106(a) of the Immigration and Nationality Act (as in effect before its repeal by section 306(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1252 note)) shall be treated as if it had been filed as a petition for review under section 242 of the Immigration and Nationality Act (8 U.S.C. 1252)."

11

determinations "may be reversed by this court only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Adefemi v. Ashcroft, 386 F.3d 1022, 1026 (11th Cir. 2004).

An alien who arrives in or is present in the United States may apply for asylum. See INA § 208(a)(1), 8 U.S.C. § 1158(a)(1). The Attorney General or the Secretary of Homeland Security has discretion to grant asylum if the alien meets the INA's definition of a "refugee." See INA § 208(b)(1), 8 U.S.C. § 1158(b)(1); REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231 (May 11, 2005) (amending INA § 208(b)(1) and adding the Secretary of Homeland Security). A "refugee" is:

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. . . .

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). The asylum applicant carries the burden of proving statutory "refugee" status. See Al Najjar, 257 F.3d at 1284. To establish asylum eligibility, the alien must, with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor, in this case political opinion,

12

will cause such future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287.

The INA does not expressly define "persecution" for purposes of qualifying as a "refugee." See INA § 101(a)(42), 8 U.S.C. § 1101(a)(42). It does, however, provide that:

> For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

INA § 101(a)(42)(B), 8 U.S.C. § 1101(a)(42)(B).

It is "well-established" that the well-founded fear inquiry contains both an objective and subjective component, i.e., the petitioner must be genuinely afraid and that fear must be objectively reasonable. Al Najjar, 257 F.3d at 1289. As we have noted, "persecution" is an "extreme concept," requiring more than "a few isolated incidents of verbal harassment or intimidation," or "[m]ere harassment." Sepulveda v. United States Attorney Gen., 401 F.3d 1226, 1231 (11th Cir. 2005). Furthermore, it is the petitioner's burden to present "specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution."

13

Al Najjar, 257 F.3d at 1287 (quotation and citation omitted).

Here, Huang admitted at her hearing that she was not pregnant and had never had children. Thus, she clearly had not been forced to undergo an abortion or involuntary sterilization. However, Huang relies on the "other resistance to a coercive population control program" clause to argue that her refusal to undergo a state-ordered gynecological exam, combined with her 20-day detention for refusing to attend it, meets the statutory definition of INA § 101(a)(42)(B), 8 U.S.C. § 1101(a)(42)(B). She directs this Court's attention to the Ninth Circuit's decision in Li v. Ashcroft, supra.

In Li, the Ninth Circuit granted a petition for review where the petitioner established that Chinese officials, in response to her open defiance of the coercive family planning policies, forced the petitioner to undergo a 30-minute gynecological examination that the petitioner described as "rape-like." See generally Li, 356 F.3d at 1156-61. The Ninth Circuit's description of the facts of the case is as follows:

> Accused of being pregnant and told to end her relationship with [her boyfriend], Li responded by stating: "I'm going to have many babies . . . you have nothing to do with this." The village official responded with a pointed warning: "You will pay for this." Two days later, two government nurses picked up Li from her home and took her to the local birth control department, where two men pinned her down on a bench while a doctor conducted a forced gynecological examination. Surrounded by four persons involved in the thirty-minute examination, Li screamed in protest to no avail. Her attempts to resist

14

were overcome by brute force. After the officials determined that Li was not pregnant, she was again pointedly warned: "If you keep on doing this, we will take you back any minute we want to give you [another] examination. And if you are found to be pregnant, then you are subject to abortion and your boyfriend will also be . . . sterilized."

Id. at 1156. Later, after being denied a marriage license, the petitioner sent out wedding announcements anyway and a warrant was issued for her arrest. Id.

The facts in the present case do not approach the severity of those in Li. Her testimony was that she was required to attend a state-ordered gynecological exam as part of what appeared to be an educational program regarding family planning. This exam was not ordered as the result of some altercation between Huang and a village official. Although her first exam caused her pain, she did not describe it as "rape-like." She was not, like the petitioner in Li, physically restrained by other men or threatened with abortion or sterilization if she became pregnant. Instead, she refused to attend a state-ordered gynecological examination and was detained for 20 days before being extricated by her father. She did not indicate that she had, in any way, been forcibly mistreated or restrained while a gynecological examination was performed. Her testimony was that she was asked to have an examination and write a letter of repentance, which she refused to do. In short, the facts of Huang's case fall well short of those in Li and, therefore, Li is inapposite.

While Huang's case was pending on appeal, we discussed the Li opinion and addressed the "other resistance to a coercive population control program" clause,

15

remanding the case for the BIA to determine whether the petitioner's acts of verbally and physically resisting an injection procedure, having two intrauterine devices (IUD) inserted against her will, or privately removing two governmentally imposed IUD's could be construed as falling under the "other resistance" clause. Yang v. United States Attorney Gen., No. 03-16068, manuscript op. at 15-16 (11th Cir. July 29, 2005). In Yang, we found that the petitioner's situation resembled that of the petitioner in Li because the petitioner there, like in Li, was forcibly removed from her home and restrained at a hospital as she verbally and physically resisted a forced injection. Id. at 10-13. Here, Huang has not alleged that she was forced to receive either an injection or an IUD at the hands of the Chinese government. Thus, Yang, like Li, is inapposite to Huang's case.

Because the BIA's decision states that Huang failed to meet her burdens of proof, it follows that the BIA did not believe that Huang had established either the "extreme concept" of persecution or "other resistance to a coercive population control program" as required to demonstrate her eligibility for asylum. On the basis of the record evidence, it does not appear that a "reasonable adjudicator would be compelled to conclude to the contrary." See INA § 242(b)(4)(B), 8 U.S.C. § 1252(b)(4)(B). Unlike in Li, where the forced gynecological exam was preceded and accompanied by threats, lasted 30 minutes, and was performed under resistance requiring physical restraint, the exam here lasted 20 minutes, and

16

although Huang described it as painful, she did not indicate that it was sexually assaulting. Moreover, while her 20-day detention was in response to her failure to appear at her next exam, the record does not indicate that she was threatened or intimidated in any way. Nor was she, like the petitioner in Yang, forcibly held down while she resisted an injection or forced to receive a government-inserted IUD. Accordingly, the record does not compel a reversal here because the BIA's determination that Huang's evidence did not amount to "persecution," and, therefore, did not establish eligibility for asylum, was not unreasonable.

Finally, Huang's brief makes little, if any, argument regarding her eligibility for withholding of removal. To the extent that she argues that she was entitled to withholding of removal, however, Huang had to show that her life or freedom would "more likely than not" be threatened upon return to his country because of, among other things, his political opinion. Mendoza v. U.S. Attorney General, 327 F.3d 1283, 1287 (11th Cir. 2003); INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A). This standard is more stringent than the "well-founded fear" standard for asylum, and since Huang is unable to meet the well-founded fear standard for asylum, she is unable to qualify for withholding of removal. See, e.g., Al Najjar, 257 F.3d at 1292-93.

We, thus, conclude that the BIA's decision is reviewable, and because the record does not compel a reversal, we deny Huang's petition.

17

**PETITION DENIED.**