[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 5, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-13944
Non-Argument Calendar

_____

BIA No. A95-872-193

EDGARD HUMBERTO PAREDES,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(March 5, 2007)**

Before BLACK, MARCUS and FAY, Circuit Judges.

PER CURIAM:

Edgard Humberto Paredes, a native and citizen of Venezuela, petitions this Court for review of the Board of Immigration Appeals' ("BIA") affirmance of the immigration judge's ("IJ") decision denying his applications for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158, 1231, 8 C.F.R. § 208.16. Paredes argues that substantial evidence in the record supported his assertion that he would suffer future persecution if he returned to Venezuela based upon his membership in a particular social group, namely, homosexual men infected with human immunodeficiency virus ("HIV"). For the reasons set forth more fully below, we deny Paredes's petition for review.

Paredes entered the United States on January 29, 2002 as a nonimmigrant visitor with authorization to remain until July 28, 2002. Paredes remained beyond his authorized date and the former Immigration and Naturalization Service ("INS")[1] issued him a notice to appear, charging him with removability pursuant to INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B). In his application for asylum and withholding of removal, Paredes indicated that he sought relief based upon his membership in a particular social group. Paredes had not experienced past harm or mistreatment in Venezuela, but he feared such if returned to Venezuela,

---

[1]The INS was abolished on March 1, 2003, and replaced with the Department of Homeland Security ("DHS"). See Homeland Security Act, Pub.L.No. 107-296 (Nov. 25, 2002), 116 Stat. 2135. This case, however, was initiated while the INS was still in existence. Therefore, this opinion refers to the INS rather than the DHS as the relevant agency.

specifically, that he would suffer physical harm because he was gay and would be denied medical treatment because he had HIV and acquired immunodeficiency syndrome ("AIDS").

Paredes testified at his removal hearing that he first came to the United States in 1987 and that he left and returned approximately 20 to 25 times. In January 2002, Paredes left the United States to attend his mother's funeral in Venezuela and, upon his return, he applied for asylum. The IJ then asked Paredes's counsel to describe his theory of the case. Counsel stated that Paredes alleged that he qualified for asylum based upon his membership in a particular social group, namely, homosexual male with HIV. Counsel also indicated that Paredes's case was based upon a pattern or practice of persecution against members of Paredes's social group in Venezuela, but that Paredes did not allege that he suffered past persecution.

On direct examination, Paredes testified that he had been in a domestic partnership for nearly six years. He also stated that he had HIV and AIDS. He took an antiviral cocktail of medications to control his disease. Paredes's medications were paid for through his domestic partner's insurance. Paredes further testified that he sought asylum in the United States because he feared that, if he returned to Venezuela, he would not be able to secure employment or his medications. Before he came to the United States in 1987, Paredes witnessed two

3

raids on gay bars by the Venezuelan police. Paredes further stated that he would not be able to obtain health insurance in Venezuela because the insurance companies would require an HIV test and would deny him insurance coverage based upon his positive HIV status.

On cross-examination, Paredes testified that the Venezuelan police regularly stop, harass, extort, or sexually abuse gay people, and that the police are rarely prosecuted for that behavior. Paredes noted that such behavior was against the law, but that the law was not actually enforced. He acknowledged that Venezuelan law provided for health care for everyone and a constitutional amendment prohibiting discrimination based on sexual orientation had been proposed but it did not succeed. Paredes stated that he could not live an openly gay life in Venezuela. He acknowledged that there had been gay pride parades in Venezuela without interference. Paredes also testified that he had brought three of his partners with him to visit Venezuela. He stated that it was easy to not be recognized as gay during his one-week trips to Venezuela, but if he were to stay longer he would be unable to live the way that he did in the United States.

Paredes's counsel then called Jesus Aguais as an expert witness and questioned him as to his qualifications to serve as an expert witness. Aguais stated that he was Venezuelan and the director and founder of Aid for Aids, an organization that provided free HIV medicine to people in Latin America, and a

4

clinical study specialist for St. Vincent's Hospital, an HIV clinic in New York City. He further testified that his expertise came from his "very close involvement with the gay community and the HIV community." Aguais did not know Paredes aside from the immigration proceedings. With regard to Aid for Aids, Aguais testified that the organization had an office in Venezuela. He stated that he began working with the Venezuelan gay community in 1988. At St. Vincent's, Aguais works with immigrants and 78 out of his 200 patients in 2003 were Venezuelan, 95 percent of those were gay, and all were HIV positive. Aguais also advised his patients about applying for asylum.

On cross-examination with regard to Aguais's qualifications to serve as an expert witness, Aguais testified that he never studied asylum or immigration law. He had participated in international AIDS workshops. He acknowledged that he had not attended any conference that dealt specifically with refugee problems regarding gay male Venezuelans, but he also stated that such a conference did not exist.

In an attempt to clarify what areas of expertise Aguais would testify to, Paredes's counsel stated that Aguais was an expert on two areas: (1) issues of HIV and HIV medications in Venezuela; and (2) issues that gay HIV positive men face in Venezuela, as Aguais knows about from his experience in working with such men that arrive directly from Venezuela. The government objected to Aguais's

5

status as an expert witness, arguing that Aguais could not simply testify regarding what his third-party patients had told him about the situation in Venezuela. The IJ qualified Aguais as a limited expert "in what [Paredes's] counsel mentioned based upon the curriculum vitae that[] he's provided and his background with the undocumented immigrants in New York."

Aguais then testified that, in his opinion, it would be difficult for a person similarly situated to Paredes to get his HIV medications in Venezuela because: (1) to obtain the medicines through social security, Paredes would have to get a job; (2) it would be unlikely that Paredes could obtain the medicines through the public health system because the priority is for women and children; and (3) Paredes would not qualify for private insurance because he is HIV positive. Aguais testified that, despite the prohibition of the practice, most of the employers in Venezuela require medical exams and will not hire HIV positive employees. He further stated that, in his opinion, it would be impossible for Paredes to live an openly gay life in Venezuela because he would be physically and verbally harmed. Based upon his experience in Venezuela, including his two recent trips there, Aguais believed that Venezuela was a very homophobic country.

In support of his application, Paredes submitted numerous documents, of which the following are relevant to this appeal. First, a letter from Feliciano Reyna, the president of a Venezuelan AIDS service organization, indicating that

6

the Venezuelan Supreme Court had ruled that the Venezuelan government had to provide AIDS treatment to all infected persons, but that the government had been slow to comply and generally provided aid only to women and children. Reyna further stated that the government's actions particularly affected gay men. He also indicated that most employers in Venezuela participated in unauthorized HIV tests prior to offering employment and, if an individual tested positive for HIV, the employer would likely not give a job offer. Reyna stated that health care providers also discriminated against gay men and that, even though such discrimination was against the law, the government did not prosecute the discriminators.

Second, a letter from Jesus Medina, the executive director of "Alianza Lamda de Venezuela," a non-profit organization benefitting the gay and transgendered community of Venezuela, indicated that police brutality against gays was a significant problem. Third, a newspaper article from "Antorcha, El Rotativo de Oriente" entitled "For Eight Days: Faggots will be held in jail by government's decree." The article indicated that police had arrested many men during a party in Venezuela and it listed the men by name. Fourth, a newspaper article from "Rebublicagay.com" detailing a police raid on a gay bar and the detention of gay men for nine hours after the raid. Fifth, a newspaper article from "El Nacional," indicating that discrimination against homosexuals in Venezuela is pervasive and that there is "a general accepting behavior of tolerance toward violence against

7

other people just because they are different." Sixth, a statement from a police commandant in a Venezuelan state indicating that "prostitutes and homosexuals . . . can not walk in the street freely" and that they must be observed under a police code. Seventh, a newspaper article from "El Nacional" describing a gay-rights organization's condemnation of Venezuela's president Hugo Chavez's public homophobic comments. Eighth, a letter from Renate Koch, the director of Accion Ciudadana Contra el SIDA, indicating that homosexuals in Venezuela suffer from harassment by police and a stigmatization at the workplace and in society. Koch's letter also stated that gay men are given the last priority in obtaining HIV health care, the supply of HIV medication in Venezuela is "frequently erratic and interrupted," and employers still conduct blood testing despite the government's ban against the practice.

As its documentary evidence, the government submitted the "Assessment to Refer" that was prepared by an asylum officer when Paredes applied for asylum. The assessment indicated that "country conditions reports establish that there is no well-founded fear of persecution for homosexuals in Venezuela from society or the government." It further stated that over 50,000 people had attended the 2002 Venezuelan Gay Pride Celebration. The assessment also noted that, in 1999, a constitutional assembly drafted a new Constitution, which included specific antidiscrimination protection for homosexuals. At the time of the assessment,

8

however, the new Constitution had not been approved. The assessment further indicated that the Venezuelan Supreme Court ruled in 2001 that HIV/AIDS treatment had to be freely available to all Venezuelans and that individuals with AIDS had a right to work, to privacy, and to be free from discrimination.

The IJ also sua sponte considered as part of the record the 2003 Department of State Country Report on Human Rights Practices in Venezuela ("country report"). The country report made no mention of human rights violations against homosexuals or individuals with HIV or AIDS. The report did indicate that, in June 2003, "several hundred participants demonstrated against discrimination toward homosexuals and to demand equal rights for them." The report did not indicate whether this demonstration was peaceful or violent.

The IJ issued a written decision denying Paredes's applications for asylum and withholding of removal. The IJ first found that Paredes's testimony was credible and that he did not claim that he suffered past persecution in Venezuela. The IJ also found that Paredes's characteristics of being a homosexual man with AIDS qualified him as a member of a particular social group. However, the IJ nonetheless found that Paredes had not established a subjective and objective well-founded fear of persecution on account of his sexual orientation and health status. Specifically, the IJ determined that,

> [Paredes] has never been subjected to any type of discrimination,

9

much less persecution, on account of his sexual orientation and health status in the past. Moreover, [Paredes] has not provided any direct evidence to demonstrate that . . . if returned to Venezuela he will be the subject of persecution based on his sexual orientation and health status. Further, [Paredes] did not provide any direct evidence to indicate that the government of Venezuela either controls or sponsors persecution of homosexuals and HIV/AIDS infected individuals in Venezuela.

The IJ further found that the evidence demonstrated that Venezuela had "taken affirmative steps to protect its citizens from discrimination based on their sexual orientation and health status" because: (1) the constitutional assembly had proposed a constitutional amendment prohibiting discrimination on the basis of sexual orientation; (2) the Supreme Court of Venezuela had ruled that free health care must be available to all citizens with HIV or AIDS; and (3) that those infected with the disease be free to work, have privacy, have healthcare, and be free from discrimination. As to Aguais's expert testimony, the IJ gave it limited weight because the IJ determined that Aguais's opinion was based primarily on his accounts of third parties' experiences that he learned through his work with the gay and HIV infected community of New York. The IJ also found that Paredes's fear of employment discrimination did not rise to the level of persecution where the Venezuelan government had made it illegal to engage in blood tests as a condition of employment but some individual employers still required blood tests. Finally, the IJ determined that what was "most compelling" was that Paredes had returned

10

to Venezuela numerous times before he applied for asylum and that he was accompanied by his domestic partners on at least three of those trips. The IJ indicated that those trips did not comport with Paredes's fear of persecution in Venezuela. The IJ also found that, because Paredes did not meet the lower standard for eligibility for asylum, he also did not meet the higher standard for withholding of removal and CAT relief.

Paredes appealed the denial of his applications to the BIA, arguing that the IJ committed errors of law and fact in failing to: (1) credit relevant record evidence; (2) address the testimony of two expert witnesses; (3) properly interpret and weigh the testimony of one expert witness; (4) address evidence that undermined government assertions; (5) apply the "pattern or practice" standard; and (6) consider authority regarding the social group definition with relation to HIV-infected individuals.

The BIA found that the IJ's factual findings were not clearly erroneous and that the IJ did not err in finding that Paredes had not established his eligibility for relief. The BIA determined that, even though the record contained "a selection of documents reflecting that members of the homosexual community in Venezuela encounter various hardships and problems, such evidence [did] not support a finding that HIV-infected homosexual men have a well-founded fear of persecution in Venezuela." Based upon that determination, the BIA found that there was no

pattern or practice of persecution against HIV-infected homosexuals by the government or a group the government is unwilling or unable to control. The BIA thus concluded that Paredes had not established that he had a well-founded fear of persecution based on a protected ground if he returned to Venezuela or that it was more likely than not that he would have been persecuted upon returning to Venezuela. Accordingly, the BIA affirmed the IJ's decision "based upon and for the reasons set forth therein" and dismissed Paredes's appeal.

On appeal, Paredes admits that he had suffered no past persecution in Venezuela, and, thus, the issues on appeal pertain to future persecution only. Paredes argues that the IJ erred in failing to consider his evidence under the "pattern or practice" standard set forth in 8 C.F.R. § 208.13(b)(2)(iii). Paredes contends that the IJ did not conduct a "pattern or practice" review, but rather inquired into only the identity of the persecutor. Paredes also maintains that Susanto v. United States Att'y Gen.,[2] a recent unpublished opinion by this Court, supports his argument that an IJ must consider the "pattern or practice" standard where a party argues that his case presents such facts.

He further argues that, even if this Court determines that the IJ considered the "pattern or practice" standard, substantial evidence supports a finding that there was a pattern or practice of persecution against HIV-infected homosexual men in

---

[2]Susanto v. U.S. Att'y Gen., 185 Fed.Appx. 871 (11th Cir. 2006) (unpublished).

12

Venezuela, which manifested itself in the denial of employment, harassment, unlawful detention, beatings of homosexual men by police, and the denial of access to medical treatment. He asserts that the IJ failed to consider other record evidence including letters from Jesus Medina, Renate Koch, and the report by Amnesty International. Paredes also argues that the IJ's reliance on the out-dated information regarding the proposed anti-discrimination constitutional amendment, which the IJ pulled from the asylum officer's assessment to refer, was erroneous because Paredes testified that the proposal had never been approved.[3] Paredes finally argues that the IJ erred in narrowing Jesus Aguais's expert testimony after the IJ allowed Aguais to testify on the conditions HIV-infected homosexual men faced in Venezuela.

When the BIA issues a decision, we review only that decision, except to the extent the BIA expressly adopts the IJ's decision. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). "Insofar as the [BIA] adopts the IJ's reasoning, we will review the IJ's decision as well." Id. Here, the BIA adopted the IJ's reasoning and included its own remarks. Thus, we will review both the IJ's and BIA's decisions. To the extent that the IJ's and the BIA's decisions were based on

---

[3]Paredes does not argue before this Court, nor did he argue before the BIA, that the IJ erred in denying his application for withholding of removal under the CAT. Thus, Paredes abandoned his request for CAT relief. See Al Najjar, 257 F.3d at 1283 n.12 (petitioner abandons issues not raised before the BIA and in initial brief before this Court).

legal determinations, our review is de novo.  D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 817 (11th Cir. 2004).  The IJ's and BIA's factual determinations are reviewed under the substantial evidence test, and we "must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole."  Al Najjar, 257 F.3d at 1283-84 (quotation omitted).  Therefore, a finding of fact will be reversed "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal . . . ."  Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc), cert. denied, 125 S.Ct. 2245 (2005); see also 8 U.S.C. § 1252(b)(4)(B) ("[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary . . .").

To establish eligibility for asylum, the applicant has the burden of proving that he is a "refugee," which is defined as:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion

8 U.S.C. §§ 1158(b)(1), 1101(a)(42)(A); see also Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005).  Thus, an applicant may establish eligibility for

14

asylum through evidence that he has suffered past persecution or has a well-founded fear of future persecution. 8 C.F.R. § 208.13(b). Here, Paredes admits that he was never subjected to past persecution in Venezuela, but contends that he has a well-founded fear of future persecution. To establish a well-founded fear of future persecution, an applicant may demonstrate either that he will be singled out for persecution or that

> there is a pattern or practice in his . . . country of nationality . . . of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion and . . . [t]he applicant establishes his . . . own inclusion in, and identification with, such group of persons such that his . . . fear of persecution upon return is reasonable.

8 C.F.R. § 208.13(b)(2)(iii). The regulations do not define "pattern or practice" of persecution, but we have explained that persecution is an "extreme concept" and "mere harassment does not amount to persecution." Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005) (quotations omitted).

To establish eligibility for withholding of removal, the petitioner must meet a standard more stringent than the "well-founded fear" asylum standard, and "show that h[is] life or freedom would 'more likely than not' be threatened upon return to h[is] country because of, among other things, his political opinion." Huang v. U.S. Att'y Gen., 429 F.3d 1002, 1010-11 (11th Cir. 2005) (citing Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003) and INA § 241(b)(3)(A), 8 U.S.C.

15

§ 1231(b)(3)(A)).  Thus, an applicant who is unable to meet the standard for asylum is also unable to meet the more stringent standard for withholding of removal.  Huang, 429 F.3d at 1011 (citing Al Najjar, 257 F.3d at 1292-93).

A detailed review of the IJ's and BIA's decisions in this case reveals that both analyzed Paredes's case under the pattern or practice standard.  Specifically, the IJ methodically determined that Paredes had not shown evidence (1) of past persecution; (2) that he would be singled out for future persecution based on his sexual orientation or health status if he returned to Venezuela; and (3) "that the government of Venezuela either controls or sponsors persecution of homosexuals and HIV/AIDS infected individuals."  While the IJ's decision does not explicitly mention the pattern or practice standard, the third determination mentioned above reasonably relates to the question of whether the Venezuelan government, or any group beyond the government's control, exhibits a pattern or practice of persecution against members of Paredes's social group in Venezuela.  See 8 C.F.R. § 208.13(b)(2)(iii).  The IJ's analysis tracks the framework as set forth in the regulations.  See generally 8 C.F.R. § 208.13(b)(1)-(2).  Moreover, the BIA did explicitly mention the pattern or practice standard and found that the IJ correctly concluded that Paredes had not met his burden under that standard.

Paredes's reliance on this Court's unpublished opinion in Susanto is misplaced.  In Susanto, we granted a petition for review and remanded the case to

16

the BIA because it was unclear whether the BIA specifically considered Susanto's pattern or practice claim, and, thus, we did not have a sufficient basis for review. Susanto, 185 Fed.Appx. at 873. As discussed above, however, the IJ and BIA in Paredes's case adequately considered Paredes's pattern or practice claim and we have a sufficient record for review. Accordingly, the IJ and BIA properly considered Paredes's claims under the applicable regulatory framework, including the pattern or practice standard of eligibility for asylum.

Paredes also contends on appeal that, even if the IJ and BIA analyzed his claims under the proper standard, substantial evidence did not support the IJ's determination that Paredes failed to establish eligibility for asylum. However, substantial evidence in the record supports the IJ's finding. First, as the IJ found, the record indicated that the Venezuelan government had taken affirmative steps toward protecting homosexual individuals and HIV-infected individuals: (1) the Venezuelan Supreme Court ruled that health care for HIV-infected individuals had to be freely available from the government; (2) the government proposed a constitutional amendment to prohibit discrimination on the basis of sexual orientation, but it ultimately did not pass; and (3) the government banned employers from requiring employees to undergo blood tests prior to employment Paredes submitted testimonial and documentary evidence that contradicted the above-mentioned evidence, specifically, that the government had protections for

17

homosexuals and HIV-infected individuals in place, but that the government did not readily enforce those protections. Nevertheless, the existence of a potential alternate conclusion that may be derived from the evidence does not justify a reversal from this Court. See Adefemi, 386 F.3d at 1027.

Furthermore, the evidence in the record may support a finding that there is discrimination against HIV-infected homosexual men in Venezuela, but that discrimination does not rise to the level of persecution. See Sepulveda, 401 F.3d at 1231 (explaining that persecution is an "extreme concept"). For example, the news articles that Paredes submitted establish that the police participated in arbitrary arrests of homosexual men and that there existed a culture of discrimination toward homosexuals. Although such discrimination is reprehensible, it does not rise to the level of persecution that would compel reversal of the IJ's decision. See Sepulveda, 401 F.3d at 1231 ("[m]ere harassment does not amount to persecution") (quotation omitted). Paredes's claim that there is a pattern or practice of persecution against HIV-infected homosexual men in Venezuela is further undercut by his multiple trips back to Venezuela with and without his domestic partners over the past 20 years.

Paredes further argues that substantial evidence supports his assertion that there is a pattern or practice of persecution against HIV-infected homosexual men because the Venezuelan government does not provide needed medical care to such

18

individuals. According to Paredes's expert witnesses, namely, Aguais, Reyna, and Koch, the Venezuelan government required that the public health system provide health care to HIV-infected individuals, but that the government prioritized the medication distribution such that women and children were served first. Thus, the witnesses concluded that HIV-infected homosexual men were usually left without medical treatment. Again, while this system of health care is regrettable and evidences discrimination toward homosexual men, it does not rise to the level of persecution necessary for the grant of asylum. Similarly, Venezuelan employers' practice of requiring blood testing prior to employment is discriminatory, but not persecution, in light of the fact that the Venezuelan government has banned the practice. Moreover, Paredes's expert witness, Aguais, testified that his own organization provides HIV medications to people in Venezuela, and, thus, it is at least possible for HIV-infected homosexual men to obtain medications through means other than the Venezuelan government. Lastly, the 2003 country report did not mention any human rights violations or general violence against homosexual or HIV-infected individuals. Accordingly, substantial evidence in the record supports the IJ's determination that Paredes failed to establish past persecution in Venezuela, or a well-founded fear of future persecution if he returned to Venezuela, on account of his membership in a particular social group, namely, HIV-infected homosexual men.

19

With regard to Paredes's argument that the IJ limited or narrowed the expert testimony of Jesus Aguais, that argument is also without merit. Paredes's counsel stated at the hearing that Aguais's expert testimony was submitted to explain the following issues: (1) the HIV disease and HIV medications in Venezuela; and (2) hardships that gay HIV positive men faced in Venezuela, as Aguais knew about from his experience in working with such Venezuelan men in the United States. In the written decision, however, the IJ gave limited weight to Aguais's testimony because the IJ determined that his expertise derived from his "close involvement and medical treatment of the gay and HIV immigrant community in [New York]." Contrary to Paredes's argument on appeal, the IJ's decision to limit the weight of Aguais's testimony does not amount to a limiting or narrowing of the testimony that the IJ initially allowed Aguais to provide. As the government asserts, the IJ considered Aguais's testimony in light of Aguais's experience and found that such a third-party relay of information did not justify significant weight. The weight to be afforded any evidence is within the discretion of the fact finder.

To the extent that Paredes argues on appeal that he was also eligible for withholding of removal, that argument is without merit. As noted above, the standard for eligibility for withholding of removal is more stringent than that for asylum. See Huang, 429 F.3d at 1010-11. Here, Paredes did not demonstrate his eligibility for asylum because he did not establish that he suffered past persecution

20

or had a well-founded fear of future persecution on account of a protected ground. As such, Paredes also cannot demonstrate that his life or freedom would more likely than not be threatened upon his return to Venezuela because of his membership in a particular social group. See Huang, 429 F.3d at 1011 (explaining that an applicant who is unable to meet the standard for asylum is also unable to meet the more stringent standard for withholding of removal).

For all the foregoing reasons, the IJ's finding that Paredes failed to establish his eligibility for asylum or withholding of removal on account of his membership in a particular social group is supported by substantial evidence in the record. Accordingly, his petition for review is

**DENIED.**